THE DE KALB BANK, Plaintiff-Appellee and Cross-Appellant, v. ROBERT A. PURDY *et al.*, Defendants-Appellants and Cross-Appellees.

Second District No. 2—89—1321

Opinion filed November 6, 1990.—Rehearing denied December 10, 1990.

Richard L. Horwitz and Amy S. Wood, both of Drendel, Schanlaber, Horwitz, Tatnall & McCracken, of Aurora (David J. Chroust, of counsel), for appellants Robert A. Purdy and Mary Lois Purdy.

Racine & Racine, of Sycamore (Norman H. Racine, of counsel), for appellant Farmers and Traders Bank of Shabbona.

Boyle, Cordes & Brown, of De Kalb, and James F. Gebhart and James M. Breen, both of Chapman & Cutler, of Chicago (Charles G. Brown, of counsel), for appellee.

64

JUSTICE McLAREN delivered the opinion of the court:

Defendant The Farmers and Traders State Bank of Shabbona (Shabbona) appeals from an order entered on April 4, 1985, granting partial summary judgment to plaintiff, The De Kalb Bank (De Kalb), and from a June 19, 1986, order denying the motion to vacate the April 4 order. Shabbona also appeals from a judgment order entered on December 12, 1989, against Shabbona and in favor of De Kalb for $62,743. Defendants Robert and Mary Lois Purdy (Purdys) also appeal from the April 4, 1985, order and the June 19, 1986, order. The Purdys also appeal from an order entered on July 20, 1989, striking their demand for a jury trial. Lastly, the Purdys appeal from the December 12, 1989, judgment order against them and in favor of De Kalb in the sum of $307,464.

Plaintiff, De Kalb, cross-appeals from the portion of the December 12, 1989, order denying its request for a judgment against the Purdys for attorney fees. De Kalb also cross-appeals from the portion of the December 12 order granting judgment in favor of Shabbona on counts IV and V of De Kalb's second amended complaint.

Robert Purdy is a physician and, along with his wife, is also engaged in the business of farming. De Kalb was the principal source of financing for the Purdys' farming operations. In late 1982 and early 1983 the Purdys and De Kalb engaged in substantial negotiations concerning several loans that the Purdys had outstanding with De Kalb. On March 15, 1983, the parties entered into a new loan agreement. Pursuant to this agreement, the Purdys, *inter alia*, provided De Kalb with mortgages on approximately 1,840 acres of farmland as additional collateral for past and future loans. De Kalb agreed to provide up to $3.5 million to finance the Purdys' 1983 farming operations. This credit limit was inclusive of the loans outstanding at the time.

In September 1983, Robert Purdy ordered 324 head of cattle from Saunders, Bucher, and Barber Livestock (Saunders). As had been the practice of the parties, the terms of the sale included a provision that title to the cattle remained in Saunders until the check tendered by the Purdys in payment was honored. The cattle were shipped on September 14, 1983, and arrived at the Purdy farm in four truckloads. The first three trucks arrived on September 15, and the fourth truck arrived during the early morning hours of September 16.

On September 16, Robert Purdy wrote a check drawn on De Kalb in the amount of $105,494.02 in payment for the cattle. As was the practice, Robert also executed and delivered two notes payable to De Kalb in the amount of the check. On September 27, De Kalb informed the Purdys that the funds would not be advanced, and the check writ-

ten in payment for the cattle would be dishonored. The check was returned to Saunders stamped "NSF," and the notes were returned to the Purdys. During the evening of September 27, the Purdys telephoned Saunders to discuss alternative payment and the condition of the cattle. The Purdys indicated that if they could not obtain other financing they would return the cattle. They also assured Saunders that the cattle would be properly maintained while in the Purdys' possession.

On September 30, the Purdys obtained a $45,000 loan from Shabbona. The proceeds of the loan were deposited in Robert Purdy's medical practice account. These funds, along with other funds from Robert's medical practice, were used to pay for the cattle. As security for the loan, the Purdys executed a security agreement granting Shabbona a security interest in the cattle and any proceeds from their sale. A financing statement was also executed and mailed to the office of the recorder of Lee County on October 5. The financing statement was returned to Shabbona as the fee submitted was insufficient. The statement was resubmitted with the increased fee and filed on October 14. Also, on October 6, Robert Jackson, president of Shabbona, sent a letter to De Kalb indicating Shabbona had loaned the Purdys "purchase money," and Shabbona had filed a financing statement covering the cattle.

On April 16, 1984, the Purdys began selling the cattle involved, and De Kalb filed suit against the Purdys seeking replevin of the cattle and an injunction prohibiting the sale of the cattle. The court granted a temporary restraining order prohibiting the sale of the cattle. On April 26, the parties entered into a settlement agreement dismissing both of De Kalb's claims.

The settlement agreement permitted the Purdys to sell the remaining cattle and provided that the proceeds "shall be paid to [Shabbona], by an instrument exhibiting on its face that it represents the proceeds from the sale of such cattle and the number of head sold." A full accounting was to be provided to De Kalb. The cattle were sold, and the Purdys deposited most of the proceeds in their personal account at Shabbona. The proceeds from the sale of approximately 46 head of cattle were delivered to a former farmhand as a loan. Out of the deposited proceeds, the Purdys paid Shabbona $49,117.24. This constituted repayment of the $45,000 loan with accrued interest.

On April 30, 1984, De Kalb filed its complaint against the Purdys and Shabbona seeking declaratory relief. The complaint requested the court to determine the rights and obligations of the parties with respect to the cattle in question. The complaint also requested the court

to order any and all proceeds from the sale of the cattle to be paid to De Kalb.

On September 12, 1984, De Kalb filed its motion for summary judgment. De Kalb sought judgment on the pleadings and also partial summary judgment against Shabbona, finding that Shabbona did not possess a purchase money security interest in the cattle. On December 14, the Purdys filed a cross-motion for judgment on the pleadings, claiming that the cattle were personal assets and, pursuant to the security agreement, not subject to De Kalb's security interest. Shabbona also filed its cross-motion for summary judgment claiming that, as a matter of law, it possessed a purchase money security interest in the cattle and the proceeds from their sale which was superior to De Kalb's security interest.

On April 4, 1985, the court granted partial summary judgment in favor of De Kalb and against Shabbona. The court found that Shabbona did not possess a purchase money security interest within the meaning of section 9—107 of the Uniform Commercial Code (Code) (Ill. Rev. Stat. 1985, ch. 26, par. 9—107). The court also found that, even if a purchase money security interest did exist, Shabbona's security interest was not perfected within the "twenty day 'grace' period allowed a secured party claiming a purchase money priority." (See Ill. Rev. Stat. 1985, ch. 26, par. 9—312(4).) As between Shabbona and De Kalb, the court found that De Kalb's interest had priority over Shabbona's interest. The court denied all other portions of De Kalb's motion. The Purdys' and Shabbona's motions were denied in their entirety. Shabbona filed a motion to vacate the April 4 order, and on June 19, 1986, the court denied the motion. Both Shabbona and the Purdys appeal from the April 4 and June 19 orders.

On September 14, 1987, De Kalb filed a second amended complaint. Count I of this complaint remained the same as the original complaint for declaratory judgment. Count II of this complaint was severed and is not part of this appeal. De Kalb alleged in count III that the Purdys converted the proceeds from the sale of the cattle and used them for their own benefit. De Kalb requested judgment in the sum of $173,879.43 plus punitive damages against the Purdys. Count IV alleged that Shabbona aided and abetted the Purdys' conversion of the proceeds. De Kalb requested judgment in the sum of $173,879.43 against Shabbona. Count V also sounded in conversion and alleged that Shabbona accepted payment of $49,117.27 from the Purdys in payment of a note when Shabbona knew these proceeds belonged to De Kalb. De Kalb requested judgment in the sum of $49,117.27 against Shabbona.

On October 6, 1987, the Purdys filed their answer to the second amended complaint and a two-count counterclaim. Count I of the counterclaim alleged that De Kalb breached its contract with the Purdys by not honoring the $105,494.07 draft executed by the Purdys and, therefore, is estopped from asserting any interest in the proceeds from the sale of the cattle. Count II of the counterclaim alleged that a judgment for De Kalb would result in unjust enrichment. The Purdys demanded a jury trial.

On October 28, 1987, De Kalb filed a motion to strike the Purdys' counterclaim and jury demand. The court denied the motion to strike the counterclaim, and on July 10, 1989, the court granted De Kalb's motion to strike the jury demand. The Purdys appeal from this order also.

On October 16, 1989, a bench trial commenced. On October 31, the court announced its decision, and on December 12, 1989, the court entered its judgment order. The court found that the cattle were not the Purdys' personal assets and De Kalb did have a security interest in the cattle. The court also found that the Purdys converted the proceeds from the sale of the cattle to their own use in violation of the settlement order dated April 26, 1984. The court found that De Kalb was entitled to the entire proceeds of approximately $173,900 from the sale plus interest from the date of sale in the amount of $133,585. Judgment was entered in favor of De Kalb and against the Purdys for the sum of $307,464.57 on counts I and III. The court denied De Kalb's request for attorney fees. The Purdys appeal from the judgment order entered against them, and De Kalb cross-appeals from the denial of its request for attorney fees.

The court also entered judgment on count I in favor of De Kalb and against Shabbona in the sum of $49,117.24 plus interest in the amount of $13,626.61. The court entered judgment in favor of Shabbona on counts IV and V, which were based on conversion. Shabbona appeals from the orders of the court entering judgment against the Purdys in the sum of $307,464.57 and against Shabbona for $62,743.85. De Kalb cross-appeals from the court's order entering judgment against De Kalb on counts IV and V of its second amended complaint.

The first issue we will address is whether the court erred in granting partial summary judgment in favor of De Kalb on April 4, 1985. Shabbona contends that it had a purchase money security interest in the cattle and, also, that it timely perfected this interest. Therefore, Shabbona argues the court erred in finding that De Kalb's security interest was superior to Shabbona's interest.

■ Section 9—107 of the Code defines a "purchase money security interest" as follows:

"A security interest is a 'purchase money security interest' to the extent that it is

(a) taken or retained by the seller of the collateral to secure all or part of its price; or

(b) taken by a person who by making advances or incurring an obligation gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used." (Ill. Rev. Stat. 1985, ch. 26, par. 9—107.)

This case involves the situation described in subsection (b). It is undisputed that Shabbona gave "value" to the Purdys by providing them with $45,000. However, De Kalb argues that the funds provided by Shabbona did not enable the Purdys to "acquire rights in or use of the collateral." De Kalb contends that the Purdys already possessed all possible rights in the cattle and the funds were used to satisfy a preexisting indebtedness. Shabbona contends that the funds provided allowed the Purdys to acquire title to the cattle. Therefore, the court erred in finding that Shabbona did not possess a purchase money security interest.

The only case in Illinois directly discussing this issue is *De Kalb Bank v. Klotz* (1986), 151 Ill. App. 3d 638. However, the decision in *Klotz* is not applicable to the case at bar, and this court's comments in *Klotz* on the issue presented are limited to the presentation of the Nebraska Supreme Court's decision in *North Platte State Bank v. Production Credit Association* (1972), 189 Neb. 44, 200 N.W.2d 1.

In *North Platte*, a farmer purchased cattle from a seller on open account. The farmer took possession of the cattle on November 30, 1968. The farmer entered into a loan agreement with a bank on January 30, 1969, and the farmer used the proceeds of the loan to pay the seller for the cattle. The bank claimed that it possessed a purchase money security interest in the cattle. The court disagreed, stating:

"The money advanced by the Bank enabled Tucker to pay the price to Seller for the cows. But it was not used by Tucker to acquire any rights in the cows because he already had all the possible rights in the cows he could have with *both possession and title*." (Emphasis added.) *North Platte*, 189 Neb. at 52, 200 N.W.2d at 6.

In *United States v. Hooks* (M.D. Ga. 1984), 40 Bankr. 715, a farmer sought to purchase cows from a seller. The farmer took possession of the cows for the purpose of inspecting and milking them.

Several weeks later, the farmer obtained a loan to pay for the cows. The court found the parties had agreed that title to the cows would be transferred only when financing was completed. The court stated:

"It was only after the loan was approved and closed that title passed and the loan proceeds were disbursed. The loan and its disbursement thus are closely allied to the sale. The Court is of the opinion that rigid rules of sequence should not be followed, but that an inquiry should be made to determine the relationship of the transactions. *** [T]he Court is convinced that [the creditor] obtained a purchase-money security interest in the cows sold." *Hooks*, 40 Bankr. at 721.

■■ The case at bar is distinguishable from *North Platte* in that the cattle were not purchased on open account. Unlike in *North Platte*, title did not pass upon transfer of possession. It is clear that the terms of the sale to the Purdys were such that title did not pass to the Purdys until Saunders received payment. This is similar to the situation presented in *Hooks*. We disagree with De Kalb's contention that the Purdys already possessed all possible rights in the cattle. Title is obviously a right in property, and the funds provided by Shabbona enabled the Purdys to acquire this right. We determine that there was no material issue of fact, and, as a matter of law, Shabbona did possess a purchase money security interest in the cattle purchased by the Purdys in September 1984. The trial court erred in finding otherwise.

The above determination does not completely resolve the summary judgment finding. The next issue we must address is whether Shabbona timely perfected its purchase money security interest thus entitling it to priority over De Kalb's interest.

■■ Section 9—302(1) of the Code requires the filing of a financing statement to perfect a purchase money security interest in nonconsumer goods. (Ill. Rev. Stat. 1985, ch. 26, par. 9—302(1)(d).) Concerning priorities among conflicting security interests, section 9—312(4) of the Code provides:

"A purchase money security interest in collateral other than inventory has priority over a conflicting security interest in the same collateral or its proceeds if the purchase money security interest is perfected at the time the debtor receives possession of the collateral or within 20 days thereafter." Ill. Rev. Stat. 1985, ch. 26, par. 9—312(4).

De Kalb argues that since the Purdys took possession of the cattle on September 16, 1984, and Shabbona did not file its financing statement until October 14, 1984, Shabbona did not avail itself of the

20-day "grace" period allowed by section 9—312(4). Shabbona argues that the 20-day "grace" period did not begin to run until the Purdys became debtors of Shabbona, and the Purdys granted a security interest in the cattle.

The only Illinois case discovered that directly addresses this issue is *In re Henning* (N.D. Ill. 1987), 69 Bankr. 348. In *Henning*, a bank filed a financing statement on April 7, 1982, naming the farmer/debtor and claiming a security interest in all cattle "now owned or hereinafter acquired." All parties agreed that the bank had a perfected security interest in after-acquired cattle. On August 21, 1984, a note for $72,000 and an appropriate security agreement were executed by the farmer and given to the seller of 31 head of cattle. The seller filed a financing statement on August 22. The note represented obligations of the farmer to the seller for the purchase of cattle delivered to the farmer between April 1982 and August 1984. The seller had delivered 27 of the 31 head of cattle to the farmer more than 20 days prior to the filing of the seller's financing statement. The seller claimed that he possessed a purchase money security interest in all 31 head of cattle and this interest was superior to the bank's after-acquired property security interest.

The court found that since the farmer/debtor took possession of 27 of the cows prior to the 20-day period preceding the filing, the seller's purchase money security interest was not timely perfected and was not superior to the bank's interest. (*Henning*, 69 Bankr. at 350.) However, the court went on to state:

> "The only way [seller] could prevail in this action is if he retained title to the cows after delivery to the debtor. Section 2—401(2) of the Illinois Commercial Code provides that unless otherwise 'explicitly' agreed, title passes to the buyer at the time and place at which the seller completes his performance. [Citation.] In this case there is no evidence, either implied or explicit, that [seller] retained title to the cows after delivery to the debtor. Therefore, title to the cows transferred to the debtor upon delivery and that is when the twenty-day period provided for in [section] 9—312(4) began to run." *Henning*, 69 Bankr. at 350.

■ In the case at bar, the situation is identical to that described by the court in *Henning*. Pursuant to an explicit agreement between the parties, the Purdys did not receive title to the cattle at the time they received possession. Title was transferred at a later date when the cattle were actually paid for. Therefore, it appears that the 20-day period should not begin to run on the date that only possession

is transferred.

This position is supported by *In re Ultra Precision Industries, Inc.* (9th Cir. 1974), 503 F.2d 414. In *Ultra Precision,* a creditor had loaned the debtor money and was granted a security interest in certain after-acquired property. This security interest was perfected. Subsequently, the debtor entered into an agreement concerning the purchase of several machines from a vendor. The agreement provided that the vendor would deliver and install the machines and the debtor would have a reasonable period of time in which to test the machines' performance. The machines were delivered on April 30, 1968, and on June 30, the testing was completed. On July 31, the vendor and debtor executed a purchase money security interest/sales agreement. The vendor assigned its rights under the agreement to a bank which filed a financing statement on August 5. The creditor claimed that the machines were subject to the after-acquired property provision of its security agreement. The creditor also claimed the debtor was a debtor in possession on the date of delivery and the purported security interest obtained by the vendor and later assigned to the bank was not perfected within 10 days (the statutory time period allowed under California law) of this delivery date.

The court rejected the creditor's argument, stating that the term "debtor" as used in the section of the Code dealing with purchase money security interest means *debtor of the holder of the purchase money security interest in the collateral.* (*Ultra Precision,* 503 F.2d at 417.) The court stated that the debtor was not a "debtor" of the prospective vendor/purchase money security holder until the sale was consummated and the security agreement was executed. (*Ultra Precision,* 503 F.2d at 417.) The court reasoned that, prior to that time, the vendor/purchase money security holder had no definitive security interest in the machines which could be perfected by the filing of a financing statement, and the debtor had no assignable legal interest in the machines which could fall into the grasp of the creditor's after-acquired property security clause. (*Ultra Precision,* 503 F.2d at 417.) The court held that the debtor became a purchase money security interest debtor receiving possession at the time the security agreement was executed. *Ultra Precision,* 503 F.2d at 417; see also *Hooks,* 40 Bankr. at 722; *State Bank & Trust Co. v. First National Bank* (Tex. App. 1982), 635 S.W.2d 807, 808-09.

De Kalb cites *North Platte* which, it argues, states the contrary view that the "grace" period begins to run at the time possession of the security is transferred. In supporting its position that the time period begins to run on the date possession is transferred, the court

in *North Platte* stated:

> "The purchase money priority is an exception to the first to file rule, and it should be applied only in accordance with the limitations established by the Code. To interpret section 9— 312(4), U.C.C., in the manner the Bank urges would not only be contrary to the plain meaning of the language used in the statute but would expose an original lender to such serious practical risks that the whole structure of the Code would be impaired or endangered, because the original lender could never feel sure that he could rely on his collateral in his future dealings with the debtor." *North Platte*, 189 Neb. at 54, 200 N.W.2d at 7.

We note, however, that *North Platte* involved a situation in which the debtor had simultaneously obtained both possession *and title* to the security in question. In this case, the Purdys did not have title to the cattle at the time they took possession. The concern that the original lender could not "rely on his collateral in his future dealings with the debtor" is not relevant to the situation at bar. At the time the Purdys took possession of the cattle, the cattle could not have come under the after-acquired property clause of De Kalb's security agreement because the Purdys did not own them. Additionally, it must be remembered that the court in *North Platte* found that a purchase money security interest did *not* exist. We feel the discussion concerning the perfecting of a purchase money security interest was needless in *North Platte*, as there was no purchase money security interest involved. *North Platte* does not refute the position that the running of the "grace" period begins on the date that the debtor becomes a debtor of a holder of a *valid* purchase money security interest in the collateral.

De Kalb also cites *In re Automated Bookbinding Services, Inc.* (4th Cir. 1972), 471 F.2d 546. In *Automated,* the bankrupt party had executed a note and a chattel mortgage security agreement including an after-acquired property clause to Finance Company of America (FCA). Subsequently, the bankrupt party purchased machinery from Hans Mueller Corporation (HMC), which retained a valid purchase money security agreement covering the machinery. The terms of the sales agreement provided for instalment payments to be made on the machinery. The bankrupt party took possession of the machinery on June 2, 1970. However, the machines were not fully installed until June 19, 1970. Installation was the responsibility of the seller under the terms of the sales agreement.

The court held that the bankrupt party took possession on June 2

and completion of tender of delivery terms is irrelevant to when possession takes place. (*Automated,* 471 F.2d at 553.) The court stated: "[P]ossession under §9—312(4) is not dependent upon completion of tender of delivery terms which affect only the buyer and seller of the goods." *Automated,* 471 F.2d at 553.

The case at bar is distinguishable because in *Automated,* as in *North Platte,* the debtor received all possible rights in the collateral on the date of delivery. In the instant case it is not simply a delivery term that is unsatisfied; it is the transfer of title. The transfer of title in this case does not "affect only the buyer and seller of the goods." As previously stated, the cattle would not fall within the parameters of De Kalb's after-acquired property security interest until the Purdys took title to the cattle. Similarly, the Purdys could not grant Shabbona a security interest in cattle that it did not own. This "term" of the agreement affects the rights of others and not just buyer and seller.

De Kalb also cites *Bank of Madison v. Tri-County Livestock Auction Co.* (1971), 123 Ga. App. 768, 182 S.E.2d 687. In *Bank of Madison,* the bank loaned money to a debtor and perfected a security interest in after-acquired property. Subsequently, the debtor entered into an agreement to purchase 40 head of cattle from a seller. A term of the agreement was that title would not pass until the check tendered in payment was honored. The debtor received possession of the cattle, but his check was dishonored. The debtor sent the cattle back to the seller so they could be sold. The seller was to recoup the money owed by debtor while the bank would receive any overage. The seller never filed a financing statement. The bank argued that its security interest was entitled to priority over any interest claimed by the seller. The court found that, where a seller sells property to a purchaser as a cash sale and surrenders possession to the purchaser without payment, the purchaser acquires all title which the seller had or had power to transfer. (*Bank of Madison,* 123 Ga. App. at 769, 182 S.E.2d at 689.) The court, citing the Georgia Uniform Commercial Code, stated that any reservation by the seller of the title in goods delivered to the buyer is limited in effect to a security interest. (*Bank of Madison,* 123 Ga. App. at 769, 182 S.E.2d at 689.) Therefore, the court held that the bank's perfected security interest was entitled to priority over the seller's unperfected purchase money security interest. *Bank of Madison,* 123 Ga. App. at 769-70, 182 S.E.2d at 689.

*Bank of Madison* involved a purchase money security interest being retained by a seller as described in section 9—107(a) of the Code.

(See Ill. Rev. Stat. 1985, ch. 26, par. 9—107(a).) The court's decision does not refute the position that the time period within which to perfect a purchase money security interest begins to run when the debtor becomes the debtor of the holder of a valid purchase money security interest in the collateral. In *Bank of Madison*, the debtor became the debtor of a holder of a valid purchase money security interest (the seller) when possession was tendered. This is when the period began to run.

We believe that the comments expressed in *Henning*, and the holding in *Ultra Precision*, apply to the case at bar. While we feel that the decisions in *North Platte, Automated*, and *Bank of Madison* are all valid decisions, we decline to apply these decisions blindly as we find these decisions were rendered in materially different factual contexts. These cases are not inconsistent with *Ultra Precision*. While we acknowledge that *Ultra Precision* involves a situation in which there was a "test" or "trial" period, we feel that the underlying rationale applies to the facts of this case. All of the above-cited cases hold that the "grace" period allowed a *valid purchase money security interest holder* begins to run at the time the debtor becomes the debtor of the holder of a valid purchase money security interest in the collateral. This is true with respect to the cases involving section 9—107(a) and also the cases involving section 9—107(b) of the Code.

Additionally, it seems a harsh result that, while Shabbona could not have been granted a security interest in the cattle at the time of possession due to a lack of the Purdys' ownership of the cattle and Shabbona's failure to give value, when the Purdys' ownership was established and Shabbona did provide value, it was too late for Shabbona to perfect the security interest received.

We find that, in this case, the 20-day statutory period did not begin to run until the Purdys acquired title to the cattle in question and became indebted *to Shabbona* as the holder of an unperfected purchase money security interest. The filing on October 14 was within the period allowed by section 9—312(4) and perfected Shabbona's purchase money security interest. Therefore Shabbona's security interest is entitled to priority. We need not determine whether the attempted filing on October 6 was sufficient to perfect Shabbona's interest. The court erred in granting partial summary judgment to De Kalb and by not granting summary judgment in favor of Shabbona.

The disposition of the above issues resolves both the Purdys' and Shabbona's appeals from the grant of partial summary judgment en-

tered on April 4, 1985, and the denial of the motion to vacate entered on June 19, 1986. This disposition also resolves in Shabbona's favor its appeal from the court's December 12, 1989, order entering judgment on count I in favor of De Kalb and against Shabbona for $62,743. Resolution of the above issue also disposes of De Kalb's cross-appeal from the court's order entering judgment for Shabbona on count V of De Kalb's complaint. It is axiomatic that Shabbona cannot convert monies to which it is legally entitled.

■■ The next issue we address is whether the trial court erred in striking the Purdys' jury demand. The denial of a jury demand is within the discretion of the trial court. (*Greene v. City of Chicago* (1976), 48 Ill. App. 3d 502, 513.) Section 13 of Article I of the Illinois Constitution provides: "The right of trial by jury as heretofore enjoyed shall remain inviolate." (Ill. Const. 1970, art. I, §13.) The right to a jury trial should be liberally construed in favor of the party requesting a jury, and the trial court should be inclined to protect that right. (*Williams v. National Super Markets, Inc.* (1986), 143 Ill. App. 3d 110, 111.) In a declaratory judgment action, the right to a jury trial depends upon the relief sought. (*Zurich Insurance Co. v. Raymark Industries, Inc.* (1987), 118 Ill. 2d 23, 57-58.) "When a declaration of rights is the only relief sought, the predominant characteristics of the issues in dispute determine whether there exists the right to a jury trial. If additional relief is sought, the nature of that relief determines the right to a trial by jury." *Zurich*, 118 Ill. 2d at 58, citing *Lazarus v. Village of Northbrook* (1964), 31 Ill. 2d 146, 148.

■ Count I of De Kalb's second amended complaint was brought pursuant to section 2—701 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—701) and sought a declaratory judgment and the payment of money. Count III of plaintiff's complaint alleged conversion and sought $173,879 in compensatory damages and $50,000 in punitive damages. It is obvious that De Kalb sought relief in addition to a mere declaration of rights. Therefore, it is the nature of this additional relief that determines whether a jury trial is proper.

The nature of the additional relief requested is money damages for breach of contract and conversion. The request for money damages is a legal as opposed to an equitable remedy. Additionally, the Purdys filed a counterclaim alleging breach of contract and estoppel. As their prayer for relief, the Purdys requested the court to award them the net proceeds from the sale of the cattle. Both parties are requesting more than a declaration of rights. This additional relief,

as well as the underlying claims, are all premised on the loan agreement executed by the parties. The claims are basically for breach of contract.

De Kalb claims that these "other" claims are all ancillary to the declaration of rights under the agreement and, therefore, the Purdys are not entitled to a jury trial. If this were true, all breach of contract actions would be heard in equity because a court must always determine the rights and obligations of the parties in deciding whether a breach occurred and the amount of damages suffered as a result of the breach. De Kalb is clearly seeking legal relief. We determine that the court abused its discretion by denying the Purdys' jury demand.

█ De Kalb contends that even if the court erred in denying the Purdys' demand for a jury trial, this court should not remand for a new trial because there is no issue of fact to be presented to a jury on retrial. While a situation such as described by De Kalb may not require a remand for a new trial, we find that there are issues of fact to be considered in count I of the case at bar. Among the many factual issues presented are: whether the cattle are the personal assets of the Purdys; whether the cattle were cared for with funds supplied exclusively by De Kalb, Shabbona, the Purdys, or all three parties; and how do the parties' actions reflect upon their stated obligations under the loan agreement. These are all questions that should have been answered by a jury. This is especially true due to our finding that Shabbona did have a perfected purchase money security interest in the cattle. We find that this cause must be remanded for a new trial before a jury on count I against the Purdys.

We also find the court's judgment against the Purdys on their counterclaims and the court's judgment against De Kalb denying De Kalb's claim against the Purdys for attorney fees must be retried before a jury. As these claims are all centered around the loan agreement and the intended rights thereunder, they are intertwined with the factual questions raised by count I. These claims are remanded to the trial court along with count I against the Purdys for a jury trial.

While we find the above claims involving the Purdys must be retried before a jury, for the reasons stated below we find that count III against the Purdys for conversion and count IV against Shabbona for aiding and abetting conversion do not have to be retried before a jury. The trial court's decisions on these counts can be reviewed and disposed of as a matter of law.

█ Count III alleges a cause of action for conversion against the Purdys. "The elements of conversion are (1) unauthorized and wrong-

ful assumption of control or ownership by one person over the personalty of another; (2) the other person's right in the property; (3) the right to immediate possession of the property; and (4) a demand for possession." (*Naiditch v. Shaf Home Builders, Inc.* (1987), 160 Ill. App. 3d 245, 269.) Our supreme court, quoting section 222A of the Restatement (Second) of Torts (1965), stated that " '[c]onversion is an intentional exercise of dominion or control over a *chattel* which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel.' " (Emphasis added.) *In re Thebus* (1985), 108 Ill. 2d 255, 259.

 The initial inquiry is whether the elements of conversion, such as would support an action in trover, are present. "Trover lies for specific chattels wrongfully converted, and not for money had and received for payment of debts. It does not operate on chattels generally, but specifically, such as money in coin or bills, animals, or other property capable of identification as being the actual property or thing wrongfully taken and converted." (*Kerwin v. Balhatchett* (1909), 147 Ill. App. 561, 565-66; see also *Janes v. First Federal Savings & Loan Association* (1973), 11 Ill. App. 3d 631, 637.) "[T]rover will not lie for money given to a defendant to be used for a particular purpose, which defendant converts to his own use or which may be found due upon an accounting." *Kerwin*, 147 Ill. App. at 566.

 In the case at bar, De Kalb attempts to claim that the Purdys "converted" money by spending it. This is not the basis of conversion. Conversion may have taken place when the cattle were sold and "converted" into money, but De Kalb authorized this conversion. Money cannot be the subject of conversion unless it is the specific coins and bills that are being sought by the plaintiff such as is the case with rare coins. While De Kalb may have a cause of action against the Purdys for money due and owing, their cause of action is not for conversion.

De Kalb cites *C.O. Funk & Sons, Inc. v. Sullivan Equipment, Inc.* (1982), 89 Ill. 2d 27, as support for the contention that money can be specific chattel. However, *Funk* is not an action for conversion. *Funk* deals with a situation in which a party is trying to attach its security interest onto proceeds of a sale of collateral by specifically identifying the proceeds. The court in *Funk* was concerned with specifically identifying the proceeds to determine if a security interest survived the commingling of the proceeds with other funds. This court also addressed that issue in *Central Production Credit Associa-*

*tion v. Hans* (1989), 189 Ill. App. 3d 889. While these cases provide in-depth discussions concerning "tracing" proceeds of the sale of security to determine if a security interest in specific property is still attached to certain sums of money, they do not address conversion and whether money can be converted absent an allegation that the money can be *specifically* identified.

We find that, as a matter of law, the Purdys did not commit conversion by using the monies deposited in their account at Shabbona.

■■ ■ Count IV of De Kalb's second amended complaint alleges that Shabbona aided and abetted the Purdys in converting the proceeds of the sale of the cattle. The trial court found Shabbona did not aid and abet the Purdys' conversion and was not liable to De Kalb. A judgment rendered in a bench trial will not be disturbed unless it is contrary to the manifest weight of the evidence. (*Ruggio v. Ditkowsky* (1986), 147 Ill. App. 3d 638, 642.) A reviewing court will not reverse a judgment of the trial court if there is evidence to support the judgment. (*Ruggio*, 147 Ill. App. 3d at 642.) Due to our disposition of count III above, the court's decision on count IV in favor of Shabbona must be affirmed. Since the Purdys did not convert the proceeds of the sale of the cattle, Shabbona could not possibly have aided and abetted the conversion. This court may affirm a judgment on any ground warranted, regardless of whether it was relied upon by the trial court. (*Material Service Corp. v. Department of Revenue* (1983), 98 Ill. 2d 382, 387.) The trial court's judgment on count IV is affirmed.

For the foregoing reasons, the decisions of the circuit court of De Kalb County on counts IV and V of plaintiff's second amended complaint are affirmed. The court's decision on count III is reversed. The court's decision on count I, entering judgment against the defendant Shabbona, is reversed. All other decisions relating to count I pertaining to the plaintiff and the defendant Purdy are vacated, and these issues are remanded to the trial court for a trial before a jury.

Affirmed in part; reversed in part; vacated and remanded in part.

GEIGER and INGLIS, JJ., concur.