[675 NYS2d 626]

GENERAL ELECTRIC CAPITAL COMMERCIAL AUTOMOTIVE FINANCE, INC., Respondent, v SPARTAN MOTORS, LTD., et al., Defendants, and GENERAL MOTORS ACCEPTANCE CORPORATION, Appellant.

Second Department, July 20, 1998

## APPEARANCES OF COUNSEL

*Robert W. Fink,* Goshen, for appellant.

*McCabe & Mack, L. L. P.,* Poughkeepsie (*Jace D. McKeighan* and *Richard R. DuVall* of counsel), for respondent.

## OPINION OF THE COURT

FRIEDMANN, J.

■ This appeal arises from a dispute between two automobile finance companies as to which had a superior security interest in two Mercedes-Benz cars—part of the inventory of the defendant Spartan Motors, Ltd. (hereinafter Spartan), a now-defunct car dealership. The issue presented is whether by advancing Spartan the funds to purchase the vehicles after Spartan itself had already paid for and received them, the defendant General Motors Acceptance Corporation (hereinafter GMAC) thereby acquired a purchase-money security interest in the merchandise that could defeat a previously perfected security interest in all of Spartan's inventory held by the plaintiff, General Electric Capital Commercial Automotive Finance, Inc. (hereinafter GECC). We conclude that under the circumstances presented here, GMAC has established that its postpurchase advance entitled it to a purchase-money security interest in the disputed collateral such that its lien enjoyed priority over GECC's prior "dragnet" lien.

### FACTS

On September 28, 1983, a predecessor of GECC entered into an "Inventory Security Agreement" with Spartan in connection with its "floor plan" financing of the dealership's inventory. By assignment of that agreement, GECC acquired a blanket lien (otherwise known as a "dragnet" lien) on Spartan's inventory to secure a debt in excess of $1,000,000. "Inventory" was defined in the agreement as "[a]ll inventory, of whatever kind or nature, wherever located, now owned or hereafter acquired, and all returns, repossessions, exchanges, substitutions, replacements, attachments, parts, accessories and accessions thereto and thereof, and all other goods used or intended to be used in conjunction therewith, and all proceeds thereof (whether in the form of cash, instruments, chattel paper, general intangibles, accounts or otherwise)". This security agree-

ment was duly filed in the office of the Dutchess County Clerk and with the New York State Secretary of State.

On July 19, 1991, Spartan signed a new Wholesale Security Agreement with GMAC, in which the latter agreed to finance or "floor-plan" Spartan's inventory. According to its terms, Spartan covenanted, *inter alia,* as follows:

"In the course of our business, we acquire new and used cars, trucks and chassis ('Vehicles') from manufacturers or distributors. We desire you to finance the acquisition of such vehicles and *to pay the manufacturers or distributors therefor.*

"We agree upon demand to pay to GMAC *the amount it advances or is obligated to advance to the manufacturer or distributor* for each vehicle with interest at the rate per annum designated by GMAC from time to time and then in force under the GMAC Wholesale Plan.

"We also agree that to secure collectively the payment by us of *the amounts of all advances and obligations to advance made by GMAC to the manufacturer, distributor or other sellers,* and the interest due thereon, GMAC is hereby granted a security interest in the vehicles and the proceeds of sale thereof ('Collateral') as more fully described herein.

"The collateral subject to this Wholesale Security Agreement is new vehicles held for sale or lease and used vehicles acquired from manufacturers or distributors and held for sale or lease * * *

"We understand that we may sell and lease the vehicles at retail in the ordinary course of business. We further agree that *as each vehicle is sold, or leased, we will faithfully and promptly remit to you the amount you advanced or have become obligated to advance on our behalf to the manufacturer, distributor or seller"* (emphasis supplied).

It is not disputed that GMAC's security agreement was duly filed. In addition, by certified letter dated July 17, 1991, GMAC officially notified GECC of its competing security interest in Spartan's inventory, as follows:

"This is to notify you that General Motors Acceptance Corporation holds or expects to acquire purchase money security interests in inventory collateral which will from time to time hereafter be delivered to Spartan Motors Ltd. of Poughkeepsie, New York, and in the proceeds thereof.

"Such inventory collateral consists, or will consist, of the types of collateral described in a financing statement, a true copy of which is annexed hereto and made a part hereof".

On May 7, 1992, Spartan paid $121,500 of its own money to European Auto Wholesalers, Ltd. to acquire a 1992 600 SEL Mercedes-Benz. Six days later, on May 13, 1992, GMAC reimbursed Spartan and the vehicle was placed on GMAC's floor plan.

On July 7, 1992, Spartan paid $120,000 of its own money to the same seller to acquire a second 1992 600 SEL Mercedes. Two days later, on July 9, 1992, GMAC reimbursed Spartan for that amount and placed the second vehicle on its floor plan. The two vehicles remained unsold in Spartan's showroom.

A few months later, on or about October 2, 1992, GECC commenced this action against Spartan, seeking $1,180,999.98, representing money then due to GECC under its agreement with Spartan. Claims were also made against the principals of Spartan, upon their guarantees, as well as against GMAC and Mercedes-Benz of North America, Inc. (hereinafter MBNA), to determine lien priority in the collateral.

After commencement of the litigation, Spartan filed a bankruptcy petition and ceased doing business. GECC, GMAC, and MBNA took possession of and liquidated their respective collateral pursuant to a prior agreement between the parties. Among the assets appropriated and sold by GMAC were the two Mercedes-Benz automobiles, which were auctioned for $194,500.

Since commencing this action, GECC has apparently settled its claims against all of the defendants except GMAC, which it has accused of converting the two Mercedes-Benz vehicles in violation of GECC's antecedent security interest.

The court granted GECC's motion for summary judgment (and, upon reargument, adhered to its original determination), finding persuasive GECC's argument that a literal reading of GMAC's security agreement with Spartan, in conjunction with the wording of Uniform Commercial Code § 9-107 (b), required a holding that GMAC had a purchase-money secured interest *only* to the extent that it paid funds *directly* to "manufacturers, distributors and sellers" of Spartan's inventory *in advance* of the transfer of the merchandise to the car dealership. The court reasoned that because "[n]owhere in the contracts of adhesion signed by Spartan with GMAC is there an obligation by GMAC to *reimburse* Spartan for funds used to purchase automobiles" (emphasis supplied), GECC's previously perfected security interest in all of Spartan's inventory should prevail.

We now reverse and, upon searching the record, grant summary judgment to GMAC.

### ANALYSIS

A perfected purchase-money security interest provides an exception to the general first-in-time, first-in-right rule of conflicting security interests. Thus, a perfected purchase-money security interest in inventory has priority over a conflicting prior security interest in the same inventory (*see,* UCC 9-312 [3]). However, as the Supreme Court, Dutchess County, observed, the purported purchase-money security interest must fit within the Uniform Commercial Code definition to qualify for the exception.

Uniform Commercial Code § 9-107 defines a "purchase money security interest" as a security interest:

"(a) taken or retained by the seller of the collateral to secure all or part of its price; or

"(b) taken by a person who by making advances or incurring an obligation gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used".

The issue here is therefore whether GMAC's payment as reimbursement to Spartan *after* it had acquired the two Mercedes-Benz vehicles on two different occasions qualifies as an "advance" or "obligation" that enabled Spartan to purchase the cars, such that GMAC acquired a purchase-money security interest in the vehicles. The arguments *against* finding a purchase-money security interest under these circumstances are basically twofold: Firstly, of the few courts to construe Uniform Commercial Code § 9-107 (b), many have been reluctant to decide that a purchase-money security interest has been created where, as here, title to and possession of the merchandise have passed to the debtor *before* the loan is advanced. Secondly, the literal wording of the agreement between GMAC and Spartan appears to accord GMAC purchase-money secured status only when the finance company paid Spartan's "manufacturer, distributor or other seller" *directly.* As the Supreme Court noted, nothing in GMAC's contract with Spartan appears to contemplate any obligation on the part of the financier to "reimburse" the auto dealership for funds that the latter had already expended to purchase merchandise. These two interrelated arguments will be discussed *seriatim.*

(1) *Whether after-advanced funds may qualify for purchase-money security status under Uniform Commercial Code § 9-107 (b).*

Research indicates that there is no judicial authority in New York construing the application of UCC 9-107 (b) *vel non,* to

circumstances such as those presented here. Indeed, there has been little judicial discussion in any jurisdiction of the applicability of UCC 9-107 (b) to a creditor's subsequent reimbursement of a debtor for an antecedent purchase of collateral. Accordingly, it is appropriate to examine the legislative history of UCC 9-107 (b), to arrive, if possible, at the intent of the framers.

Professor Grant Gilmore, one of the original drafters of UCC article 9 (*see, MBank Alamo Natl. Assn. v Raytheon Co.,* 886 F2d 1449, 1459), has explained that UCC 9-107 (b) was enacted at least in part to liberalize the rather rigid traditional rules, e.g., regarding the circumstances under which purchase-money secured status could be obtained by a creditor who enables a debtor to acquire new inventory (*see,* Gilmore, *The Purchase Money Priority,* 76 Harv L Rev 1333, 1373 [1963]).

For example, whereas under pre-Code law a person who advanced the purchase price on a buyer's behalf *directly to the seller* would be found to have a purchase-money interest in the items so acquired, no such security interest was guaranteed to the person advancing money *to a buyer* who then used the funds to pay for merchandise (*see, e.g., Manlove v Maggart,* 111 Ind App 398, 41 NE2d 633; *Hughbanks, Inc. v Gourley,* 12 Wash 2d 44, 120 P2d 523). Under UCC 9-107 (b), however, if a financier can show both that his advance was made for the purpose of enabling the debtor to acquire the collateral and that it was in fact so used, he will be accorded purchase-money secured status (Gilmore, *The Purchase Money Priority, op. cit.,* at 1373).

Similarly, under pre-Code law the *sequence* of the transfers was dispositive. Indeed, as Professor Gilmore noted, even UCC 9-107 (b), on its face, seems to assume "the sequence of loan first and acquisition second or * * * that the loan and acquisition take place simultaneously." (*Id.,* at 1374.) Where, for example, "the buyer pays the price (or writes a check) on Monday and borrows that amount from the secured party on Tuesday," the secured party is faced with the obvious difficulty of satisfying both the " 'to enable' " and the " 'in fact so used' " prongs of the statute (Gilmore, *id.,* at 1374). However, under the Code, "in * * * the hypothetical [case] just put a court could reasonably find that the secured party had acquired a purchase money interest. If the loan transaction appears to be *closely allied* to the purchase transaction, that should suffice. The evident intent of paragraph (b) is to free the purchase money concept from artificial limitations; rigid adherence to

particular formalities and sequences should not be required" (Gilmore, *id.,* at 1374 [emphasis supplied]; *see also,* 2 Gilmore, Security Interests in Personal Property § 29.2, at 782; 8A Anderson, Uniform Commercial Code § 9-107:26, at 529 [3d ed]; 4 White and Summers, Uniform Commercial Code, § 33-5, at 325-326 [Practitioner's 4th ed]).

If under UCC 9-107 (b) neither the chronology of the financing nor the configuration of the cash flow is, without more, dispositive (*see, e.g.,* Clark, Law of Secured Transactions Under the Uniform Commercial Code § 3.09 [2] [a] [rev ed 1993]), how can we tell if a loan transaction is sufficiently "closely allied" to a purchase transaction to qualify for purchase-money status?

One factor that courts have considered is simple temporal proximity—that is, whether the value is given by the creditor "more or less contemporaneously with the debtor's acquisition of the property" (*Matter of Brooks,* 29 UCC Rep Serv 660, 663-664 [US Bankr Ct, D Me]). However, it should be noted that early drafts of UCC 9-107 contained an additional subdivision (c), which envisioned a purchase-money interest to the extent of value advanced for the purpose of financing new acquisitions within 10 days of the debtor's receiving possession of the new goods, *even though the value was not in fact used to pay the price.* The subdivision was deleted, according to the sponsors, because it extended the purchase-money interest too far (*see,* Gilmore, *The Purchase Money Priority, op. cit.,* at 1374, n 97, citing 1956 Recommendations of Editorial Board for Uniform Commercial Code § 9-107). It appears, then, that mere closeness in time is but another mechanical circumstance to be considered—a significant clue, but not one dispositive of the relationship between the transactions.

The authorities are agreed that the critical inquiry, as in all contract matters, is into the intention of the parties (*see, e.g., Township of Stambaugh v Ah-Ne-Pee Dimensional Hardwood,* 841 F Supp 803; *New W. Fruit Corp. v Coastal Berry Corp.,* 1 Cal App 4th 92, 99, 1 Cal Rptr 2d 664, 668; *see also,* 8A Anderson, Uniform Commercial Code, *op. cit.,* at 529). "In determining whether a security interest exists, the intent of the parties controls, and that intent may best be determined by examining the language used and considering the conditions and circumstances confronting the parties when the contract was made" (*Baldwin v Hays Asphalt Constr.,* 20 Kan App 2d 853, 857, 893 P2d 275, 279). In assessing the relationship of the transactions, the test should be whether the availability of the loan was a factor in negotiating the sale, and/or

whether the lender was committed at the time of the sale to advance the amount required to pay for the items purchased (*see, Matter of Hooks,* 39 UCC Rep Serv 332, 341 [US Bankr Ct, MD Ga]; 8A Anderson, Uniform Commercial Code, *op. cit.,* at 529; Clark, Law of Secured Transactions Under the Uniform Commercial Code § 3.09 [2] [a] [rev ed 1993]).

Applying these principles to the matter before us: (1) The record establishes that GMAC's reimbursements to Spartan following its two Mercedes-Benz purchases were only six and two days apart, respectively. (2) GECC does not dispute GMAC's contention that a postpurchase reimbursement arrangement was common in the trade, as well as routine in Spartan's course of dealing with GMAC and its other financiers, depending upon the circumstances of the purchase. For example, GMAC employee Philip Canterino, who handled GMAC's account with Spartan, has averred without contradiction by GECC that although it was customary for GMAC to prepay a car manufacturer before it delivered new vehicles to Spartan's showroom, in a case of the sort at issue here—where the vehicles were difficult to obtain from the manufacturer but were readily available from a distributor—it was not uncommon for GMAC to reimburse Spartan after the cars had been delivered to Spartan's showroom, upon Spartan's presentation of proof of clear title. In the language of Uniform Commercial Code § 9-107 (b): GMAC was committed to give value to enable the car dealership to acquire rights in the collateral. The value so extended was intended to and in fact did enable Spartan to acquire the two Mercedes-Benzes, as GECC does not seriously suggest that without GMAC's backing Spartan could have afforded to purchase the expensive vehicles. Accordingly, the literal requirements of Uniform Commercial Code § 9-107 (b) are satisfied, notwithstanding the inverted purchase-loan chronology (*see, e.g., Matter of McHenry,* 3 UCC Rep Serv 2d 1545 [US Bankr Ct, ND Ohio]; *Thet Mah & Assocs. v First Bank,* 336 NW2d 134 [Sup Ct, ND]). Because GMAC's loans were "closely allied" with Spartan's inventory acquisitions, GMAC enjoys a purchase-money security interest in the contested merchandise (*see, e.g., Matter of Hooks, supra).*

Concededly, in making assessments of this sort, courts have considered an important factor to be whether or not title had passed to the borrower before the loan was issued (*see, e.g., De Kalb Bank v Purdy,* 205 Ill App 3d 62, 562 NE2d 1223 [purchase-money status clear where title to cattle did not pass until creditor advanced payment]; *Matter of Hooks, supra* [cred-

itor had purchase-money security interest where legal owner-
ship in cows was not transferred to the debtor until loan
closed]). This is because, where the borrower already possesses
all possible rights in the collateral, the value extended by the
creditor looks more like a loan procured to satisfy a pre-existing
debt than an advance "enabl[ing] the debtor to acquire rights
in * * * the * * * collateral" (UCC 9-107 [b]). However, it
seems ill-advised to create an artificial rule premised upon this
circumstance, as there will be cases where a purchase-money
arrangement will not be established even though title has *not*
passed, and other cases, like the one before us, where the pass-
ing of title is irrelevant to the creditor's demonstration that the
value he extended was closely allied to the purchase of the
collateral. In this regard, it is worthy of note that the *Hooks*
court, and to some degree the *De Kalb* court as well, treated
the passage of title as merely one element to consider—albeit a
significant one—in applying the "closely allied" test to arrive at
the parties' intentions (*see, e.g., Matter of Hooks, supra,* at 340-
341; *De Kalb Bank v Purdy, supra,* 205 Ill App 3d, at 68-69,
562 NE2d, at 1226-1227).

A classic case holding the opposite, *North Platte State Bank
v Production Credit Assn.* (189 Neb 44, 200 NW2d 1), relied
upon by GECC, is distinguishable for many reasons. There, the
borrower took a loan from the plaintiff bank approximately one
and one-half months after purchasing certain cattle, without
informing the bank that the loan was intended for any particu-
lar purpose. The *North Platte* court noted that the debtor had
merely borrowed money several weeks after acquiring title to
and possession of a herd of cattle in order to discharge an ante-
cedent debt. Although the "closely allied" test was not discussed
by the *North Platte* court, which focused instead on the preloan
passage to the debtor of all rights in the collateral, the case is
in fact an illustration of a failure to meet that test's require-
ments (*see also, e.g., First Interstate Bank v Internal Revenue
Serv.,* 930 F2d 1521; *Valley Bank v Estate of Rainsdon,* 117
Idaho 1085, 793 P2d 1257; *ITT Commercial Fin. Corp. v Union
Bank & Trust Co.,* 528 NE2d 1149 [Ind]; *Wade Credit Corp. v
Borg-Warner Acceptance Corp.,* 83 Ore App 479, 732 P2d 76;
*Matter of Manuel,* 33 UCC Rep Serv 691 [US Bankr Ct, D SC]).
In contrast to the matter before us, there was no pretransac-
tion meeting of the minds between debtor and creditor; the
bank was not "obligated" to give value to enable the debtor to
acquire rights in the collateral; and the purchase and loan
transactions were not close in time, but were nearly two

months apart. Put somewhat differently, in *North Platte* the availability of the loan was not a factor in the debtor's negotiation of the sale; and the plaintiff bank was not committed at the time of the sale to advance the amount required to pay for the items purchased.

In addition, the *North Platte* court's conclusion that the plaintiff had not acquired a purchase-money interest in the debtor's collateral was reinforced by the "even more fundamental" consideration that the plaintiff had neglected to file its security interest within 10 days of the debtor's receiving possession of the merchandise, as required by Uniform Commercial Code § 9-312 (4) (*North Platte State Bank v Production Credit Assn.,* 189 Neb 44, 51, 200 NW2d 1, 6, *supra; see also,* 4 White and Summers, Uniform Commercial Code, *op. cit.,* at 326). Here, in contrast, it is not disputed that GMAC timely filed its purchase-money security interest in Spartan's inventory, and that in July 1991 it notified GECC of that interest.

(2) *Whether GMAC's lien is circumscribed by the precise language of its agreement with Spartan.*

It is well established that the terms of a written security agreement may be amplified by "other circumstances including course of dealing or usage of trade or course of performance" (UCC 1-201 [3]; *see also,* UCC 1-205, 2-208; *New W. Fruit Corp. v Coastal Berry Corp., supra).* Here, GECC does not deny that, although the written terms of GMAC's contract with Spartan *appeared* to contemplate a single method of inventory financing (i.e., GMAC's payment to Spartan's sellers in advance of the purchase transaction), *in fact* it was not at all unusual for the parties to pursue the same end by somewhat different means (i.e., GMAC's posttransaction reimbursement to Spartan for its inventory purchases), as GMAC employee Canterino repeatedly explained.

Generally, the express terms of an agreement and a differing course of performance, course of dealing, and/or usage of trade "shall be construed whenever reasonable as consistent with each other" (UCC 1-205 [4]; 2-208 [2]). Only when a consistent construction would be "unreasonable" must express terms control over course of performance, and course of performance prevail over course of dealing and usage of trade. GMAC's election on some occasions to fund Spartan's floor planning by reimbursing the car dealership for its purchases can hardly be considered inconsistent with its decision on other occasions to accomplish the same goal by following the strict wording of the contract and prepaying the supplier directly.

Rather, it is only reasonable to consider these two methods of financing to be entirely compatible with one another.

In any event, it is well established that a written contract may be *modified* by the parties' postagreement "course of performance" (UCC 2-208 [1], [3]; *see, e.g., Farmers State Bank v Farmland Foods,* 225 Neb 1, 402 NW2d 277; *see also, Rose v Spa Realty Assocs.,* 42 NY2d 338, 343-344; *Maynard Ct. Owners Corp. v Rentoulis,* 235 AD2d 867; *Indemnity Ins. Co. v Levine,* 168 AD2d 323, 326; *Recon Car Corp. v Chrysler Corp.,* 130 AD2d 725, 729). In this regard, GECC offered no rebuttal to the testimony and affidavit of GMAC's employee who had handled the financier's account with Spartan, to the effect that it was the custom in the trade, as well as in GMAC's course of dealing with Spartan and others, for the financier to reimburse the debtor following delivery of the merchandise to the debtor's showroom, and upon presentation by the debtor of proof of clear title.

■ There is no merit to GECC's suggestion that, because Spartan and GMAC had diverged in practice from the literal language of their contract, GECC lacked notice of the inventory covered by GMAC's security interest.

Under the UCC, the identification of a secured party's collateral is adequate if it is "reasonably" specific. Normally, the designation of the generic "type" of collateral covered by a security agreement will be found to be sufficient (*see,* UCC 9-109 [4]; 9-110, 9-203 [1]; 9-402; *see, e.g., In re Gordon Car & Truck Rental,* 75 Bankr 466, *affd* 80 Bankr 12; *Lettinga v Agristor Credit Corp.,* 686 F2d 442, 448; *Matter of Laminated Veneers Co.,* 471 F2d 1124; *cf., Gulf Natl. Bank v Franke,* 563 F2d 766). Moreover, the purpose of judicial inquiry is solely to establish, first, whether the written description may reasonably be construed to include the disputed property, and secondly, whether the parties intended that the description include that property (*see, In re Gordon Car & Truck Rental, supra,* at 472; *see, e.g., In re Shop-N-Go of Maine,* 38 Bankr 731; *see also, New W. Fruit Corp. v Coastal Berry Corp., supra; cf., Matter of Mitchell v Shepherd Mall State Bank,* 324 F Supp 1029, 1032, *affd* 458 F2d 700). Here, GMAC's security agreement and its timely notice to GECC adequately specified the precise nature of the vehicular inventory to which its lien attached, such that GECC should have been alerted to GMAC's claim to the two Mercedes-Benzes; and, as discussed above, it is clear that GMAC and Spartan intended these vehicles to be covered by their financing agreement.

GECC could only have been surprised to learn that the two Mercedes-Benzes were covered by GMAC's lien had it been tracking Spartan's inventory piece by piece, and tabulating when GMAC "advanced" payment to the seller directly, as opposed to when it "reimbursed" the car dealership after the fact. In addition to being factually implausible (indeed, GECC nowhere seriously contends that it had access to GMAC's checkbook, nor does it identify in what manner it relied to its detriment on when and how GMAC discharged its individual financing obligations to Spartan), the degree of "notice" specificity sought to be imposed by GECC is far in excess of the "reasonable identification" requirement of the UCC (*see,* UCC 9-110, and Comment thereto).

### CONCLUSION

Accordingly, the Supreme Court erred when it found that, having financed the two vehicles at issue here by way of reimbursements—"the very opposite of an advance"—GMAC did not acquire a purchase-money security interest pursuant to Uniform Commercial Code 9-107 (b). Rather, since GMAC has established—and GECC does not deny—that GMAC was "obligated" to give value to enable Spartan to acquire rights in the two Mercedes-Benzes, and the purchase and loan transactions were only days apart, it is clear that Spartan's purchase and GMAC's subsequent reimbursement were sufficiently "closely allied" to give GMAC a purchase-money security interest in the subject vehicles. Under these circumstances, we conclude, upon searching the record, that GMAC is entitled to retain the proceeds of the sale of the two contested vehicles and to summary judgment against GECC (*see,* CPLR 3212 [b]).

Therefore, the appeal from the order dated October 18, 1996 is dismissed, as the right of direct appeal therefrom terminated with the entry of judgment in the action, the judgment is reversed, on the law, so much of the order dated October 18, 1996 as, upon reargument, adhered to a prior determination in an order entered July 10, 1996, which granted the motion by GECC for summary judgment against GMAC, is vacated, upon reargument, the prior determination in the order entered July 10, 1996 is vacated, and the motion by GECC for summary judgment against GMAC is denied, and upon searching the record, summary judgment is granted to GMAC against GECC.

COPERTINO, J. P., KRAUSMAN and GOLDSTEIN, JJ., concur.

Ordered that the appeal from the order is dismissed; and it is further,

Ordered that the judgment is reversed, on the law, so much of the order dated October 18, 1996 as, upon reargument, adhered to a prior determination in an order entered July 10, 1996, which granted the motion by GECC for summary judgment against GMAC, is vacated, upon reargument, the prior determination in the order entered July 10, 1996 is vacated, and the motion by GECC for summary judgment against GMAC is denied, and, upon searching the record, summary judgment is granted to GMAC against GECC; and it is further,

Ordered that GMAC is awarded one bill of costs.