**In re ENTERPRISE INDUSTRIES, INC., Debtor.**

**Fleet Capital Corporation, Plaintiff,**

**v.**

**Sutherland Presses, Defendant.**

**Bankruptcy No. 99–50684–JRG. Adversary No. 99–5348.**

United States Bankruptcy Court, N.D. California.

Jan. 4, 2001.

**164**

Frederick D. Holden, Jr., Brobeck, Phleger & Harrison, San Francisco, CA, for plaintiff.

Daniel J. Kelly, Haight, Brown & Bonesteel, San Francisco, CA, for defendant.

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

JAMES R. GRUBE, Bankruptcy Judge.

### I. INTRODUCTION

Plaintiff Fleet . Capital Corporation ("Fleet") and defendant Sutherland Presses ("Sutherland") filed cross-motions for summary judgment in the above-entitled adversary proceeding, involving a priority dispute between the parties' competing security interests in the debtor's collateral. For reasons discussed below, the Court denies Sutherland's motion for summary judgment and grants summary judgment in favor of Fleet.

### II. BACKGROUND

On September 26, 1997, debtor Enterprise Industries, Inc. ("Enterprise") executed a purchase order for a 550 ton press ("the press") from Sutherland. Four days later, on September 30, 1997, Enterprise and Sutherland entered into a Sales Agreement for the purchase of the press in the amount of $987,991.26. Under the terms of the sales agreement, Enterprise was to make a 30% down payment ($296,397.83) upon placement of the order, a 60% second payment ($592,794.76) due upon proof of shipment from the factory, and a 10% final payment ($98,799.12) due upon start-up or 60 days from the bill of lading, whichever occurred first.

The Sales Agreement also required a signed UCC–1 financing statement, and stated in pertinent part: "Sutherland Presses acting as Exclusive Agent on behalf of the Supplier retains ownership of Subject Goods until payment has been made in full for the goods for the protection of the Supplier."

The sales transaction was styled as a "turn-key package," under which Sutherland was obliged to deliver the press, along with all accessories necessary for the press's operation, at a location designated by Enterprise. Upon delivery, Sutherland was also responsible for testing and training of Enterprise's employees in the operation of the press.

On October 1, 1997, Enterprise made the $296,397.83 down payment on the press via wire transfer to Sutherland.

Five months later, on March 2, 1998, Enterprise, along with parent company TMCI, executed a Loan and Security Agreement ("Loan Agreement"), together with a Secured Promissory Note, with Fleet. The Loan Agreement provided in relevant part that Fleet would provide Enterprise with a $25 million revolving credit loan to finance the purchase of equipment for use in Enterprise's business. Fleet secured this loan by taking a comprehensive security interest or "blanket lien" in substantially all of the assets of Enterprise and TMCI, including after-acquired property.

One day later, on March 3, 1998, Fleet perfected its security interest by filing a UCC–1 financing statement with the California Secretary of State. The UCC–1 described Fleet's collateral as including Enterprise's "equipment."

As reflected in the bill of lading, the press was shipped from Sutherland's operations in Japan on March 17, 1998, bound

for Enterprise's operations in California. Later that same month, on March 25, 1998, Fleet, on behalf of Enterprise, paid the second installment on the press in the amount of $592,794.76. Fleet made this payment via wire transfer from Fleet's account directly to Sutherland's. Approximately one and a half months later, and some eight months after entering into the Sales Agreement to purchase the press, on May 13, 1998 Sutherland perfected its security interest in the press by filing a UCC-1 financing statement with the California Secretary of State.

When the press arrived in the United States, Enterprise did not take delivery immediately. Instead, Sutherland hired Triple–E Machinery Moving, Inc. ("Triple–E") to store and later deliver the press. Enterprise, however, directed where and when the press was ultimately delivered.

Triple–E delivered the press to Enterprise between May 27 and 28 of 1998. Joe Santiago of Enterprise acknowledged installation of the press in a signed Sutherland Press Acceptance Sheet dated June 19, 1998.

The final installment amount of $98,799.12 was never paid. Enterprise filed a voluntary Chapter 11 petition on January 29, 1999, and the press was later sold along with substantially all of the debtor's assets to Serra Corporation for $3,700,000. The fair market value of the press at the time of its sale was approximately $400,000.

## III. ISSUE PRESENTED

The sole issue before the Court is whether Fleet or Sutherland acquired first priority position with regard to the collateral in issue, i.e., the press. This determi-

nation turns on whether Fleet acquired a purchase money security interest in the press, which in turn depends on whether Fleet, through its payment of the second installment in the amount of $592,794.76, enabled the debtor to acquire some "rights" in the press as that term is used in California Commercial Code § 9107(b).[1]

## IV. STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c), made applicable to adversary proceedings through Federal Rule of Bankruptcy Procedure 7056, provides that the Court shall render judgment for the moving party ". . . if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

In the present matter, the parties have filed cross-motions for summary judgment, along with a stipulated set of undisputed facts. As there are no material facts in dispute, the Court is able to render judgment as a matter of law.

## V. DISCUSSION

Secured creditors Sutherland and Fleet are in dispute over their respective rights to approximately $100,000 in proceeds from the sale of the press.[2] If Sutherland's security interest takes priority over Fleet's security interest, Sutherland will recover its third installment payment of $98,799.12 [3] from the $400,000 in proceeds attributable to the sale of the press, with the balance going to pay down the $592,794.76 owed to Fleet on the second

---

1. Unless otherwise indicated, all statutory references are to Division 9 of the California Commercial Code (Secured Transactions), § 9101 et seq.

2. Section 9306(2) provides: "[A] security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the

secured party in the security agreement or otherwise, and also continues in any identifiable proceeds. . . ."

3. According to the parties' set of stipulated facts, the total owed to Sutherland on the third installment, including interest, is now $113,454.79.

installment payment. If, on the other hand, Fleet's security interest has first priority, then Fleet will take the entire $400,000 in proceeds in partial satisfaction of the debt owed to it, while the entire amount of Sutherland's third installment payment will be relegated to treatment as an unsecured claim.

It is undisputed that both Sutherland and Fleet have perfected security interests in the press, as both filed UCC–1 financing statements describing the collateral in issue with the California Secretary of State as required by §§ 9302(1) and 9401(1)(c).[4] It is likewise undisputed that Sutherland's perfected security interest is a "purchase money security interest" pursuant to § 9107(a), as Sutherland was the seller of the collateral and retained a security interest in the unpaid balance of the press.[5] As stated above, the point of contention is whether Fleet or Sutherland has first priority position.

### Rules of Priority under § 9312

Section 9312 sets forth the rules for determining priorities between conflicting security interests in the same collateral. In the typical case of two "garden variety," i.e., non-purchase money, secured creditors, § 9312(5)(a) provides that the first to file its financing statement (and thereby perfect its security interest) has priority.[6]

However, if one secured creditor has a "purchase money security interest," that creditor can take priority over a competing non-purchase money secured creditor who was first to file, provided that the purchase money secured creditor files its financing statement "at the time the debtor receives possession of the collateral or within 20 days thereafter." § 9312(4) [7]

■ Still another twist occurs where *two* purchase money secured creditors compete for priority in the same collateral. In such an instance courts and commentators agree that § 9312(4) is inapplicable. Instead, the provisions of § 9312(5)(a) control and the first purchase money secured creditor to file has priority. *See, e.g., Womack v. Newman Fixture Co.*, 27 Ark. App. 117, 785 S.W.2d 226, 228–29 (1990) ("[S]ince both the Bank and Newman had purchase money security interests, perfected by the filing of financing statements, section (4), supra, does not tell us which purchase money security interest had priority, but under the provisions of section (5) ... it would appear to go to the party who first filed a financing statement...."); *John Deere Co. v. Production Credit Ass'n of Murfreesboro*, 686 S.W.2d 904, 907–08 (Tenn.App.1984); 4 White & Sumners, Uniform Commercial Code [4th ed.1995], § 33–5 at 335 ("If Bank lends the down payment, seller lends the rest and each file within ten days, both (and therefore neither) are 'entitled to the special priority' in subsection (4). Although one might argue that such creditors should share pro rata and neither receive priority,

---

4. Section 9302(1) provides: "A financing statement must be filed to perfect all security interests except the following...." [None of the exceptions apply to this case.]

   Section 9401(1)(c) provides: "The proper place to file in order to perfect a security interest is as follows ... (c) In all other cases, in the office of the Secretary of State." [Subsections (a) and (b) do not apply to this case, as they apply to consumer goods and crops, timber and minerals, respectively.]

5. Section 9107(a) provides: "A security interest is a 'purchase money security interest' to the extent that it is (a) Taken or retained by the seller of the collateral to secure all or part of its price...."

6. Section 9312(5)(a) provides: "Conflicting security interests rank according to priority in time of filing or perfection. Priority dates from the time a filing is first made covering the collateral or the time the security interest is first perfected, whichever is earlier, provided that there is no period thereafter when there is neither filing nor perfection."

7. The full text of § 9312(4) is as follows: "A purchase money security interest in collateral other than inventory has priority over a conflicting security interest in the same collateral or its proceeds if the purchase money security interest is perfected at the time the debtor receives possession of the collateral or within 20 days thereafter."

we believe that the proper rule is to go to the subsection (5) residuary clause and award priority to the winner there.")

In this case, Fleet filed its financing statement on March 3, 1998, more than two months before Sutherland's filing date of May 13, 1998. Sutherland, however, was a purchase money secured creditor and filed its financing statement approximately two weeks before Enterprise received the press. Therefore, if Fleet does not hold a purchase money security interest in the press, Sutherland takes first priority under the terms of § 9312(4). If, on the other hand, Fleet does hold a purchase money security interest in the press, then Fleet will take first priority pursuant to § 9312(5)(a), since it filed first. Determination of priority, therefore, hinges on whether Fleet holds a purchase money security interest.

### Definition of "purchase money security interest" under § 9107(b)

█ As discussed above, § 9107(b) enables a third party financier to a purchase transaction, such as Fleet, to acquire a purchase money security interest in specific collateral where "by making advances or incurring an obligation [the third party financier] gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used." As White & Sumners elaborate:

> Subsection (b) of 9–107 allows for less familiar but equally important transactions, as where a lender agrees to lend money to a debtor so that it may, for example, buy a new line of merchandise or purchase some new equipment. To ensure that the pearly gates leading to a purchase money lender's Valhalla are not opened too wide, the drafters have made 9–107(b) rather narrow. First, the lender must have given "value" by making advances or incurring an obligation.... Second, the value must have been "to enable the debtor acquire rights in or the use of collateral," and third, such value must have been "in fact so used."

4 White & Sumners, Uniform Commercial Code [4th ed.1995], § 33–5 at 324–325.

### "Rights in the Collateral"

█ It is undisputed that Fleet meets the first and third requirements of § 9107(b), as written records reflect that Fleet wired $592,794.76 directly from its account to Sutherland's in satisfaction of the second installment due on the press. Rather, the dispute lies in § 9107(b)'s *second* requirement—whether by paying the second installment on behalf of Enterprise Fleet "enabled" the debtor to acquire some "rights in the collateral." Although the statute does not provide guidance as to how broadly the "enabling" requirement may be construed, White & Sumners provide the following explanation:

> "If the loan transaction appears to be closely allied to the purchase transaction, that should suffice. The evident intent of paragraph (b) is to free the purchase-money concept from artificial limitations; rigid adherence to particular formalities in sequences should not be required." *A court must still determine whether the loan and purchase transactions are "closely allied."*

4 White & Sumners, *supra* at 326 (emphasis added), *quoting* 2 G. Gilmore, Security Interests in Personal Property 782 (1965).

Sutherland contends that Fleet's payment was not "closely allied" with the purchase transaction in issue. Specifically, under Sutherland's rationale, the debtor "purchased" the press and thereby acquired all available "rights" in the collateral at the moment the debtor made the down payment on the press. Therefore, Sutherland argues, since Fleet's payment did not enable the debtor to acquire any additional "rights" in the press, Fleet did not acquire a purchase money security interest. Sutherland cites a number of cases in support of this argument. *See e.g., The Grange Co. v. McCabe,* 26 Cal.App.2d 597, 80 P.2d 135 (1938); *North Platte State Bank v. Production Credit Ass'n,* 189 Neb. 44, 200 N.W.2d 1, 6 (1972); *In re Mat-*

*thews,* 724 F.2d 798 (9th Cir.1984); *General Electric Capital Commercial Auto. Fin. v. General Motors Acceptance Corp.,* 246 A.D.2d 41, 48–49, 675 N.Y.S.2d 626 (1998); *Thet Mah & Associates, Inc. v. First Bank of North Dakota (NA), Minot,* 336 N.W.2d 134 (N.D.1983).

However, no case the Court is aware of supports this "all or nothing" argument. That is to say, no case cited stands for the proposition that a debtor can only acquire rights in a piece of collateral one time during a purchase transaction, effectively precluding another lender from acquiring a purchase money security interest in the same collateral.

Evidently, this question is not a common one because typical purchase transactions, like the ones in the cases cited by Sutherland, are relatively uncomplicated and transpire over a brief period of time. Hence, due to the brevity and simplicity of the "typical" purchase transaction, a debtor will often acquire all available "rights" in collateral all at once or within the space of a few hours or days. Consequently, defining the specific points in time at which a debtor acquires different rights in a piece of collateral is unnecessary to determine priority.

The *North Platte* case is illustrative of this point. In that case the debtor, a rancher, received an operating loan from Production Credit Association ("PCA") to fund the purchase of livestock. In return, the parties executed a security agreement with an after-acquired property clause covering all of the debtor's livestock, which PCA perfected by filing a financing statement. Some months later the debtor entered into a transaction to purchase 79 pregnant Angus heifers, to be paid for with a loan from North Platte State Bank ("Bank"). The debtor ordered and received the heifers in November of 1968, but the Bank did not advance the funds to pay the seller until two months later, in

January of 1969. Soon thereafter the Bank filed a financing statement to perfect its security interest.

The Bank argued that it had a purchase money security interest in the heifers pursuant to § 9–107(b) and, consequently, under § 9–312(4) its security interest took priority over PCA's blanket lien notwithstanding that PCA filed its financing statement first. The Nebraska Supreme Court disagreed, explaining that upon delivery the debtor acquired both possession of and title to the heifers. As a result, the Court held that although "[t]he money advanced by the Bank [two months later] enabled [the debtor] to pay the price to Seller for the cows .... it was not used by [the debtor] to acquire any rights in the cows because he already had all the possible rights in the cows he could have with both possession and title."[8] 200 N.W.2d at 6.

The debtor in *North Platte* acquired all rights in the heifers through execution of a simple purchase transaction. Hence, there were no remaining "rights" for the debtor to acquire once the Bank finally advanced funds for payment of the heifers.

The other cases on which Sutherland relies similarly deal with uncomplicated, straightforward purchase transactions where the debtors acquire rights in the collateral in short order. *See, e.g., In re Matthews, supra* at 800 (Lender providing refinancing loan did not acquire purchase money security interest in consumer debtors' piano and stereo where debtors "already owned" and had possession of the goods); *General Electric Capital Commercial Automotive Finance, Inc. v. Spartan Motors, Ltd., supra* at 632 (Debtor auto dealer purchased and received possession of two Mercedes automobiles; two days later, commercial lender acquired purchase money security interest in vehicles after reimbursing debtor for purchase price, since reimbursement transaction was com-

---

**8.** It is noteworthy that the *North Platte* court's holding alludes to the possibility of a third party lender enabling a debtor to acquire

"rights" in collateral where the debtor has not already acquired all available rights.

mon in the trade and "closely allied" with purchase price); *Thet Mah & Associates, Inc. v. First Bank of North Dakota (NA), Minot, supra* at 139 (Both bank and fixture company acquired purchase money security interests in debtor's restaurant equipment at the same time—when the equipment was installed in the debtor's restaurant.)

However, in contrast to the "typical" purchase scenario outlined in *North Platte* and the other cases cited, the purchase transaction in this case was comparatively long in duration and complex. It transpired in three distinct stages separated by several months, with various performance requirements placed on both parties at each stage. Thus, due to the structure of the transaction, Enterprise acquired different "rights" in the press at each successive stage.

In particular, as of the "second stage" of the purchase transaction, when Fleet wired the second installment to Sutherland, Enterprise had *not* acquired all possible rights in the press. Under the terms of the Sales Agreement, Enterprise's payment of the first installment ($296,397.26) did no more than obligate Sutherland to prepare the press for shipment from its factory in Japan. Hence, with this first payment Enterprise acquired (if anything) only a bare right to shipment of the press; it did not acquire possession of, title to, or any other apparent right in the press until *after* Fleet wired the second installment to Sutherland.[9] A detailed examination of the second stage of the purchase transaction supports this analysis.

The second installment ($592,794.76) represented 60% of the purchase price, and was "due upon proof of shipment from

[the] factory." Evidently, the transaction was structured in this manner to provide Sutherland with a measure of protection, guaranteeing that it would receive 90% of the purchase price prior to delivery. If Fleet had not paid the second installment, it is doubtful Sutherland would have permitted Enterprise to take delivery of the million dollar press while 70% of the purchase price remained outstanding (and Enterprise was in default under the terms of the contract). Fleet's payment of the second installment therefore enabled Enterprise to obtain delivery of the press, which in turn endowed Enterprise with the "rights" of both possession and title in the press.[10]

Fulfillment of the second installment payment was key to Enterprise's obtaining possession of and title to the press. Accordingly, Fleet's payment enabled Enterprise to obtain "rights" in the press and was "closely allied" with the purchase transaction.

## VI. CONCLUSION

Fleet's payment of the second installment enabled Enterprise to acquire "rights" in the press, thereby providing Fleet with a purchase money security interest in the press under the terms of § 9107(b). Furthermore, since Fleet perfected its purchase money security interest first, it takes priority over Sutherland's purchase money security interest pursuant to § 9312(5)(a). Accordingly, the Court grants summary judgment in favor of Fleet; Sutherland's cross-motion for summary judgment is denied.

---

9. California Commercial Code § 2401(2) provides:

> Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any

reservation of a security interest by the bill of lading.

As the sales agreement contained no provision for passage of title, title passed to Enterprise upon delivery, which did not occur prior to shipment from Japan.

10. Title passed to Enterprise upon delivery of the press. See FN 8, *supra*.