**FIRST NATIONAL BANK IN MUNDAY, Appellant,**

v.

**LUBBOCK FEEDERS, L.P., Appellee.**

No. 11–04–00190–CV.

Court of Appeals of Texas, Eastland.

Jan. 12, 2006.

Kevin G. Herd, Raymond B. Albertson, Goodrich, Postnikoff & Albertson, Fort Worth, for appellant.

Steven C. Haley, Moorman, Tate, Moorman, Urquhart & Haley, L.L.P., Brenham, Richard S. Hubbert, Sims, Hubbert & Wilson, Lubbock, Burt L. Burnett, Burnett & Burke, LLP, William M. Ucherek, II, Ucherek Law Firm, P.C., Abilene, for appellee.

Panel consists of: WRIGHT, C.J., and McCALL, J., and STRANGE, J.

## OPINION

TERRY McCALL, Justice.

In this appeal, First National Bank in Munday and Lubbock Feeders, L.P., claim competing security interests in the same cattle. The trial court granted summary judgment to Lubbock Feeders, holding that it had a purchase money security interest in the cattle and the proceeds from the sales of the cattle with priority over the Bank's security interest in the cattle. In three appellate issues, the Bank argues that the trial court erred in granting summary judgment. Because Lubbock Feeders met its summary judgment burden of establishing that it had a perfected purchase money security interest in the cattle, we affirm the judgment of the trial court.

### Background Facts

The Bank sued Briscoe Cattle Exchange Corp. and John William Cox for sums due

and owing on various notes. The Bank alleged that Cox had defaulted on nine notes and that he had guarantor liability on two Briscoe Cattle Exchange notes. The Bank alleged that it had a security interest in all livestock owned by Cox, wherever located and whenever acquired. The Bank sought a writ of sequestration for all of Cox's livestock, including any livestock located in Lubbock County, Texas. Lubbock Feeders intervened in the suit, alleging claims against Cox for sums due and owing on various loans. Lubbock Feeders also sought a declaratory judgment that it had a superior purchase money security interest in Cox's Lubbock County cattle.[1]

The Bank and Lubbock Feeders moved for summary judgment. Both parties claimed a superior security interest in Cox's Lubbock County cattle. The Bank did not claim that it had a purchase money security interest in Cox's Lubbock County cattle. Lubbock Feeders argued that the summary judgment evidence established the following: (1) that it had a purchase money security interest in the cattle under Section 9.103(a) of the Uniform Commercial Code (UCC)[2] because its loans to Cox enabled him to acquire his interests in the cattle; (2) that it perfected its security interest in the cattle under Sections 9.310 and 9.313 of the UCC[3] by taking possession of the cattle and by filing financing statements covering the cattle; (3) that it was not required to give the Bank notice of

its security interest under Section 9.324(d) of the UCC[4] to obtain priority status; and (4) that, even though it was not required to give the Bank notice of its security interest, it gave the Bank notice of its security interest complying with Section 9.324(d). In response, the Bank asserted the following: (1) that Lubbock Feeders failed to perfect its security interest and (2) that Lubbock Feeders failed to give the Bank the required notice of its security interest under Section 9.324(d) of the UCC. Therefore, the Bank argued that it had the superior security interest in the cattle.

The trial court granted summary judgment to Lubbock Feeders. The trial court also entered an order severing the claims between the Bank and Lubbock Feeders from the remainder of the action. Therefore, the summary judgment became final and appealable.

### Issues Presented

The Bank attacks the trial court's granting of summary judgment in three appellate issues. In its first issue, the Bank argues that the trial court applied the wrong summary judgment standard in making an "implied finding of fact" that Lubbock Feeders had a superior right and interest in the cattle. In its second issue, the Bank asserts that the summary judgment evidence created a fact issue as to (1) whether Lubbock Feeders had a perfected purchase money security interest in the

---

1. Lubbock Feeders had possession of Cox's Lubbock County cattle on its feedlot. Pursuant to an agreed order, Lubbock Feeders sold the cattle and deposited the sales proceeds, less feeding costs and yardage costs due to Lubbock Feeders, into the registry of the court. That amount totaled $104,886.43.

2. TEX. BUS. & COM.CODE ANN. § 9.103(a), (b) (Vernon 2002).

3. Tex. Bus. & Com.Code Ann. §§ 9.310, 9.313 (Vernon Supp.2005).

4. Tex. Bus. & Com.Code Ann. § 9.324 (Vernon 2002).

cattle and (2) whether Lubbock Feeders complied with requirements for priority of a purchase money security interest in livestock. In its third issue, the Bank contends that Lubbock Feeders's summary judgment evidence—the affidavit of Kyle Williams—failed to meet its summary judgment burden of establishing that no genuine issue of material fact existed.

*Standard of Review*

This case involves the review of a traditional motion for summary judgment. We will apply the well-recognized standard of review for traditional summary judgments. We must consider the summary judgment evidence in the light most favorable to the non-movant, indulging all reasonable inferences in favor of the non-movant, and determine whether the movant proved that there were no genuine issues of material fact and that it was entitled to judgment as a matter of law. *Nixon v. Mr. Property Mgmt. Co.*, 690 S.W.2d 546 (Tex.1985); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671 (Tex.1979).

*Affidavit of Kyle Williams*

Lubbock Feeders presented an affidavit from its yard manager, Kyle Williams, in support of its motion for summary judgment. Williams stated that he had familiarity with Lubbock Feeders's financed accounts with its customers and that his job duties required him to stay familiar with the accounts.

Williams explained that Lubbock Feeders operates a commercial feed yard and offers its customers feeding programs with several different payment options, including a cattle and feed financed option. Under the cattle and feed financed option, Lubbock Feeders advances a line of credit to its customer to finance the customer's purchase of cattle and makes subsequent periodic loan advances for financing feed costs and yardage. Customers choosing the cattle and feed financed option execute a loan and security agreement granting Lubbock Feeders a security interest in the customer's cattle. Lubbock Feeders documents each money advance to its customers with a loan certificate.

Williams explained in detail Cox's relationship with Lubbock Feeders. Cox fed cattle at Lubbock Feeders's feedlot under the cattle and feed financed option. If Cox wanted to purchase cattle and place those cattle with Lubbock Feeders, then Lubbock Feeders would finance 80% of the purchase price of Cox's interest in the cattle and reasonable feeding costs.

In 2002 and 2003, Cox fed cattle on the following lots, among others, at Lubbock Feeders's feed yard: Lot 101, Lot 151, Lot 277, and Lot 282. Cox and Lubbock Feeders executed feeding agreements covering all four lots. Cox had a revolving line of credit with Lubbock Feeders enabling him to borrow the money necessary to purchase his interests in the cattle. Cox signed loan and security agreements evidencing the loans. The security agreements gave Lubbock Feeders a security interest in Cox's cattle then owned or thereafter acquired.

Cox purchased all of the cattle from third party vendors at sale barn auctions. When Cox wanted to purchase a group of cattle, he submitted an invoice to Lubbock Feeders identifying the cattle by a specific head number, sex, pay weight, and price. As Cox purchased each set of cattle, Lubbock Feeders prepared a loan certificate relating to that set of cattle and showing the amount of the loan advance. All of the cattle were delivered directly to Lubbock

Feeders. Cox never had possession of the cattle. After Cox and Lubbock Feeders signed a loan certificate relating to a set of cattle and Lubbock Feeders received the set of cattle, Lubbock Feeders made an advance to Cox enabling him to complete the purchase of the cattle from the third party vendor. Lubbock Feeders made 20 loan advances to Cox on the four lots. Each advance related to a specific set of cattle.

*Lot 101*

Lubbock Feeders and Cox, each as 50% owners, placed 102 heifers with Lubbock Feeders for feeding and growing. Lubbock Feeders received and placed the 102 heifers at its feedlot as follows: (1) 70 head on June 28, 2002, and (2) 32 head on July 1, 2002. Lubbock Feeders made money advances to Cox on June 19, 2002 and July 9, 2002. The advances totaled $16,680.94. All of the cattle in Lot 101 were sold to packers.

*Lot 151*

Flintrock Cattle Company as a 50% owner, Harve Williams as a 25% owner, and Cox as a 25% owner placed 107 steers with Lubbock Feeders for feeding and growing. Lubbock Feeders received and placed the 107 steers at its feedlot as follows: (1) 21 head on September 30, 2002; (2) 28 head on October 3, 2002; (3) 21 head on October 7, 2002; (4) 3 head on October 9, 2002; (5) 6 head on October 10, 2002; and (6) 28 head on October 14, 2002. Lubbock Feeders made money advances to Cox on October 8, 2002; October 9, 2002; October 14, 2002; and October 18, 2002. The advances totaled $12,418.36. All of the Lot 151 cattle were sold to packers.

*Lot 277*

Flintrock Cattle Company and Cox, each as 50% owners, placed 86 steers with Lub-

bock Feeders for feeding and growing. Lubbock Feeders received and placed the 86 steers at its feedlot as follows: (1) 6 head on January 9, 2003; (2) 29 head on January 16, 2003; (3) 2 head on January 20, 2003; (4) 4 head on January 24, 2003; and (5) 45 head on January 30, 2003. With respect to the Lot 277 cattle, Lubbock Feeders made money advances to Cox on January 27, 2003, and January 31, 2003. The advances totaled $22,625.77. All of the Lot 277 cattle were sold to packers.

*Lot 282*

Flintrock Cattle Company and Cox, each as 50% owners, placed 94 heifers with Lubbock Feeders for feeding and growing. Lubbock Feeders received and placed the 94 heifers at its feedlot as follows: (1) 43 head on January 15, 2003; (2) 25 head on January 20, 2003; (3) 4 head on January 24, 2003; and (4) 22 head on January 30, 2003. With respect to the Lot 282 cattle, Lubbock Feeders made money advances to Cox on January 27, 2003, and January 31, 2003. The advances totaled $21,691.62. All of the Lot 282 cattle were sold to packers.

*Loan Documents*

Williams attached copies of documents detailing Lubbock Feeders's loans to Cox as exhibits to his affidavit, including the feeding agreements, loan and security agreements, loan certificates, and checks showing money advances to Cox. The documents detailed each transaction in which Lubbock Feeders advanced money to Cox for his purchase of cattle from the sale barns. Williams's affidavit, along with the attached documents, traced Cox's purchase of each set of cattle that Lubbock Feeders placed into Lots 101, 151, 277, and 282.

### *The Bank's Objections to Williams's Affidavit*

The Bank argues that Williams's affidavit failed to provide competent sum-

mary judgment proof on the purchase money security interest issues. First, the Bank asserts that the affidavit failed to demonstrate Williams was qualified or competent to testify on the security interest issues. Summary judgment affidavits must set forth facts and show affirmatively how the affiant obtained personal knowledge of those facts. *Radio Station KSCS v. Jennings*, 750 S.W.2d 760, 761–62 (Tex. 1988). Williams's affidavit addressed Lubbock Feeders's relationship with its customer, Cox, and the loans Lubbock Feeders made to Cox. In the affidavit, Williams stated that he was the yard manager for Lubbock Feeders; that he was familiar with Lubbock Feeders's customer accounts; and that the performance of his job required him to be familiar with the accounts. A person's position or job responsibilities can peculiarly qualify him to have personal knowledge of facts and establish how he learned of the facts. *Boswell v. Farm & Home Sav. Ass'n*, 894 S.W.2d 761, 768 (Tex.App.-Fort Worth 1994, writ denied). Williams's position and job responsibilities with Lubbock Feeders particularly qualified him to have personal knowledge of the facts relating to the loans to Cox, and the affidavit established how he learned of those facts. The affidavit demonstrated that Williams had personal knowledge of Lubbock Feeders's transactions with Cox. Williams was competent and qualified to testify about those transactions and the documents related to those transactions.

■ Second, the Bank asserts that Williams's affidavit contained conclusory statements. Affidavits consisting of nothing more than conclusions or expressions of subjective belief are not competent summary judgment proof. *Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex.1984).

The Bank objects to a number of Williams's statements, including statements that Lubbock Feeders had "a purchase-money lien and security interest" and that "Lubbock Feeders perfected its purchase-money security interest." Standing alone, these statements are conclusory. However, as set forth above, Williams provided detailed facts about the loan transactions in question, and the documents relating to those transactions were attached as exhibits to the affidavit. The affidavit provided specific facts tracing loan proceeds to Cox's specific purchases of cattle. An affidavit containing conclusory and subjective determinations of fact may support a motion for summary judgment if the remaining statements contain sufficient factual information to sustain the movant's burden of proof. *Marshall v. Sackett*, 907 S.W.2d 925, 933 (Tex.App.-Houston [1st Dist.] 1995, no writ); *General Prod. Co. v. Black Coral Invs.*, 715 S.W.2d 121, 123 (Tex.App.-Houston [14th Dist.] 1986, writ ref'd n.r.e.). Although Williams's affidavit contained some conclusory statements, those statements were supported by facts, and the remaining statements in the affidavit contained sufficient factual information to sustain Lubbock Feeders's burden of proof.

■ Third, the Bank apparently asserts that, because Williams was an interested witness, his affidavit will not support the granting of a summary judgment. Summary judgment based on the uncontroverted affidavit of an interested witness is proper if the evidence is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted. *Trico Techs. Corp. v. Montiel*, 949 S.W.2d 308, 310 (Tex.1997); *Republic Nat'l Leasing Corp. v. Schindler*, 717 S.W.2d 606, 607

(Tex.1986). "Could have been readily controverted" does not mean that the summary judgment evidence could have been easily and conveniently rebutted but, rather, indicates that the testimony could have been effectively countered by opposing affidavit. *Trico Techs. Corp.*, 949 S.W.2d at 310 (citing *Casso v. Brand*, 776 S.W.2d 551, 558 (Tex.1989)).

■ Williams provided specific and detailed facts about the loan transactions in his affidavit. The affidavit was clear, positive, direct, otherwise credible, and free from contradictions and inconsistencies. The affidavit contained the type of information—specific factual information about loans, including dates and amounts of loans—that is readily controvertible. *Trico Techs. Corp.*, 949 S.W.2d at 310. Therefore, the affidavit could support the granting of summary judgment.

The trial court did not err in considering Williams's affidavit as summary judgment evidence. We overrule the Bank's third issue.

*Security Interest Issues*

■ Lubbock Feeders had the summary judgment burden of establishing each of the following: (1) that it had a purchase money security interest in the subject cattle, (2) that it perfected its security interest in the cattle, and (3) that its security interest in the cattle had priority over the Bank's security interest. Lubbock Feeders argues that it had a purchase money security interest in the cattle under Section 9.103 of the UCC. Section 9.103 defines purchase money security interest in part as follows:

(a) In this section:

(1) "Purchase-money collateral" means goods or software that secures a purchase-money obligation incurred with respect to that collateral.

(2) "Purchase-money obligation" means an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used.

(b) A security interest in goods is a purchase-money security interest:

(1) to the extent that the goods are purchase-money collateral with respect to that security interest.

Thus, when a creditor makes a loan enabling a debtor to acquire an interest in goods, the creditor may obtain a purchase money security interest in the goods. Section 9.103(a)(2).

Lubbock Feeders asserts that it had a purchase money security interest in the cattle because its loans to Cox enabled him to acquire his interests in the cattle. The summary judgment evidence established that Lubbock Feeders made 20 money advances to Cox with respect to the cattle involved in the four lots. Williams's affidavit and the loan certificates demonstrated that each money advance related to a specific set of cattle. Cox purchased the cattle from third party vendors at sale barn auctions before receiving loan proceeds from Lubbock Feeders. Based on the timing of the loans, the Bank asserts that Cox acquired interests in the cattle before receiving the loan proceeds from Lubbock Feeders. Therefore, the Bank argues that the loans from Lubbock Feeders did not enable Cox to acquire interests in the cattle.

■ Section 9.103 of the UCC does not contain a requirement that the debtor

receive the loan proceeds before purchasing the collateral. Instead, Section 9.103(a)(2) requires that the loan "enable the debtor to acquire rights in or the use of the collateral." Although the Texas courts have not addressed this issue, courts from other jurisdictions have held that a creditor may obtain a purchase money security interest when the debtor receives the loan proceeds after purchasing the collateral. *In re Enter. Indus., Inc.,* 259 B.R. 163, 169 (Bankr.N.D.Cal. 2001); *In re McHenry,* 71 B.R. 60, 62–64 (Bankr.N.D.Ohio 1987); *In re Sherwood,* 79 B.R. 399, 400 (Bankr.W.D.Wis.1986); *In the Matter of Hooks,* 40 B.R. 715, 721 (Bankr.M.D.Ga.1984); *De Kalb Bank v. Purdy,* 205 Ill.App.3d 62, 150 Ill.Dec. 420, 562 N.E.2d 1223, 1226–27 (1990); *DeKalb Bank v. Klotz,* 151 Ill.App.3d 638, 104 Ill. Dec. 596, 502 N.E.2d 1256, 1258–59 (1986); *Gen. Elec. Capital Commercial Auto. Fin., Inc. v. Spartan Motors, Ltd.,* 246 A.D.2d 41, 675 N.Y.S.2d 626, 630–32 (1998). Thus, the timing of the loan does not determine whether the creditor receives a purchase money security interest in the collateral. Rather, the key consideration is whether the loan enables the debtor to acquire rights in the collateral. *Gen. Elec. Capital Commercial Auto. Fin., Inc.,* 675 N.Y.S.2d at 631–32; *In re McHenry,* 71 B.R. at 64. A creditor receives a purchase money security interest when the loan advance is "closely allied" with the debtor's purchase of the collateral at issue. *Gen. Elec. Capital Commercial Auto. Fin., Inc.,* 675 N.Y.S.2d at 631–33; *In re Enter. Indus., Inc.,* 259 B.R. at 167–70.

The summary judgment evidence established that Lubbock Feeders's loans to Cox enabled him to purchase the cattle. Each loan advance related to a specific set of cattle. Lubbock Feeders made each of the 20 loan advances to Cox within a short time after receiving the related set of cattle at its feed yard. This time period ranged from the day Lubbock Feeders received a set of cattle until 18 days after receiving a set of cattle. Cox signed a loan certificate with respect to each set of cattle. The loan certificates showed the loan advance amount and the specific cattle relating to the loan advance. The loans were "closely allied" to Cox's purchase transactions. *Gen. Elec. Capital Commercial Auto. Fin., Inc.,* 675 N.Y.S.2d at 631–33; *In re Enter. Indus., Inc.,* 259 B.R. at 167–70. Lubbock Feeders met its summary judgment burden of establishing that it had a purchase money security interest in the cattle.

■ Lubbock Feeders argues that it perfected its purchase money security interest in the cattle by taking possession of the cattle and by filing financing statements covering the cattle. A secured party may perfect a security interest in goods by taking possession of the goods or by filing a financing statement. Sections 9.310(a), (b)(6), 9.313(a); *see also Kunkel v. Sprague Nat'l Bank,* 128 F.3d 636, 644 (8th Cir.1997)(Feed yard perfected its purchase money security interest in cattle by taking possession of the cattle); *MBank Abilene, N.A. v. Westwood Energy, Inc.,* 723 S.W.2d 246 (Tex.App.-Eastland 1986, no writ).

Cox purchased all of the subject cattle from third party vendors at sale barn auctions. Lubbock Feeders received delivery of the cattle at its feed yard. Cox never had possession of the cattle. Thus, the summary judgment evidence established that Lubbock Feeders perfected its security interest in the cattle by taking possession of the cattle. Sections 9.310(b)(6) and 9.313(a); *Kunkel,* 128 F.3d at 644. Therefore, we need not address Lubbock Feed-

ers's contention that it also perfected its security interest by filing financing statements nor the Bank's contention that the financing statements filed by Lubbock Feeders were insufficient to perfect its security interest.

■ The Bank argues that Lubbock Feeders's security interest did not have priority over its security interest because Lubbock Feeders failed to comply with the notice requirements set forth in Section 9.324(d) of the UCC. In response, Lubbock Feeders argues that, because Cox never had possession of the cattle, Section 9.324(d) of the UCC did not require it to give the Bank notice of its security interest to maintain priority status. Section 9.324(d) provides as follows:

> Subject to Subsection (e) and except as otherwise provided in Subsection (g), a perfected purchase-money security interest in livestock that are farm products has priority over a conflicting security interest in the same livestock, and, except as otherwise provided in Section 9.327, a perfected security interest in their identifiable proceeds and identifiable products in their unmanufactured states also has priority, if:
>
> (1) the purchase-money security interest is perfected when the debtor receives possession of the livestock;
>
> (2) the purchase-money secured party sends an authenticated notification to the holder of the conflicting security interest;
>
> (3) the holder of the conflicting security interest receives the notification within six months before the debtor receives possession of the livestock; and
>
> (4) the notification states that the person sending the notification has or

expects to acquire a purchase-money security interest in livestock of the debtor and describes the livestock.

The issue is whether the notification requirement in Section 9.324(d) applies when the creditor maintains possession of the livestock. While Texas courts have not decided this issue, the Eighth Circuit Court of Appeals decided it in the *Kunkel* case. *Kunkel* involved facts similar to the facts in this case. A feedlot perfected a purchase money security interest in cattle by taking possession of the cattle. *Kunkel*, 128 F.3d at 644. The issue was whether the feedlot's purchase money security interest in the cattle had priority over a bank's security interest in the same cattle. *Kunkel*, 128 F.3d at 641. The Kansas UCC applied in *Kunkel*. Under the Kansas UCC, the subject cattle were classified as "inventory." *Kunkel*, 128 F.3d at 639. A creditor with a purchase money security interest in inventory could acquire priority lien status by sending notice of its security interest to holders of competing security interests within five years before the debtor received possession of the inventory. *Kunkel*, 128 F.3d at 644.

In *Kunkel*, the feedlot argued that the UCC's notice provision did not apply to its purchase money security interest because the debtor never received possession of the collateral. Therefore, the feedlot asserted that it could maintain priority status without providing notice of its security interest to holders of competing security interests. The Eighth Circuit Court of Appeals interpreted the UCC's notification requirement "to be triggered by actual possession of the inventory by the debtor." *Kunkel*, 128 F.3d at 645. Because the *Kunkel* debtor never obtained possession of the cattle, the feedlot could maintain its priority status without notifying the bank of its security interest. *Kunkel*, 128 F.3d at 645–46.

We agree with the reasoning of the *Kunkel* court. Section 9.324(d)(3) provides that the holder of the conflicting security interest must receive the notice of the purchase money security interest within six months before the debtor receives possession of the livestock. Cox never possessed the cattle. Because Cox never received possession of the cattle, the notification requirement in Section 9.324 was not triggered. Therefore, Lubbock Feeders was not required to give the Bank notice of its security interest to maintain priority status.

Based on our holding, we need not address Lubbock Feeders's alternative contention that it provided the Bank notice of its security interest complying with Section 9.324(d).

Lubbock Feeders met its summary judgment burden of establishing a superior purchase money security interest in the cattle and in the proceeds from the sales of the cattle. The trial court properly granted summary judgment to Lubbock Feeders. We overrule the Bank's first and second issues.

*This Court's Ruling*

The judgment of the trial court is affirmed.