NO. 07-12-0080-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL C

OCTOBER 10, 2012
_____

IN THE MATTER OF THE MARRIAGE OF PETER N.
CHRISTODOLOU AND KELI ANNE CHRISTODOLOU AND IN
THE INTEREST OF B.C.C. AND H.N.C., CHILDREN
_____

FROM THE 237TH DISTRICT COURT OF LUBBOCK COUNTY;

NO. 2010-553,696; HONORABLE LESLIE HATCH, PRESIDING
_____

*Opinion*
_____

Before QUINN, C.J., and HANCOCK and PIRTLE, JJ.

Sometimes you try to do right, but the law gets in the way. This is one of those times. We reverse in part and remand.

Keli and Peter Christodolou divorced each other in November of 2011 after being married for approximately eight years. Early in the marriage, they obtained a $201,000 *unsecured* loan from Peter's father (Nicholas) to buy a house and agreed to repay the sum via monthly installments of $320, plus interest at 1.9% per year.[1] The house was bought, though not all of the loan was used for the purchase, and it became the family's

_____

[1]Simple arithmetic reveals that it would have taken over fifty two years to extinguish the debt if all abided by the terms of the agreement.

homestead. Thereafter, Keli became pregnant, and Nicholas allegedly informed his son and daughter-in-law that they could suspend their monthly payments to him. By that time, only several of those installments had been made. More importantly, no others would be made.

Time passed. As it did, Nicholas died in 2008, while Peter and Keli decided to divorce in 2011. Their community estate, for the most part, consisted of their homestead, which the trial court determined had an equity of about $201,711. In deciding to award the house to Peter, it ordered him to execute a promissory note in the amount of $103,830 payable to Keli. The sum represented her one-half of the equity in the homestead plus her community share of income earned in Peter's separate financial account. Additionally, the note was to be paid in monthly increments of $3,314, and was secured (per court order) by an owelty lien placed on the house.

Yet, while the divorce was proceeding, the executor of Nicholas' estate became aware of the outstanding loan to Peter and Keli. That executor happened to be Peter's brother. The discovery led to discussions about whether the loan could be collected given the pertinent statute of limitations. To avoid incurring litigation costs to resolve the issue, counsel for the estate's executor informed the trial court that no suit would be filed. Instead, collection of the debt would most likely occur via an offset against any inheritance Peter was to receive.[2]

Thus, the trial court had before it evidence of a potential community liability that may not give rise to a lawsuit but could be satisfied indirectly. And, if satisfied in the

---

[2]We are not asked to address whether the executor's attorney may permissibly testify about his legal discussions with his client, the legal strategies his client opts to pursue, or otherwise bind his client to dispose of a legal matter in a certain way. So, that potential debate need not be considered at this time.

2

manner suggested by the executor's attorney, Peter supposedly would suffer the effects of paying it *in toto*. This led to efforts being taken to address the contingency and resulted in the trial court granting Peter an "equitable lien" against the promissory note he was to give his ex-wife. In turn, Keli was granted an "equitable lien" on the house (and homestead) awarded Peter. Apparently, this protected either party from paying more than their proportionate share of the debt. The trial court then ordered that both liens be treated as "superior lien[s], equivalent to a purchase money lien" that supercedes 1) any homestead claim Peter may have in the house and Keli may have in the note representing the proceeds from the house, and 2) her owelty lien. So too did the court declare that the manner in which it addressed the potential claim of Nicholas' estate constituted "a part of the division of the community assets and allocation of debts incurred during the marriage." Keli cried foul and appealed the decision.

No one disputes that the way a trial court divides community assets and liabilities lies within its discretion. *In re Collier,* No. 07-09-00146-CV, 2011 Tex. App. LEXIS 13, at *22-23 (Tex. App.–Amarillo January 4, 2011, no pet.). That discretion, however, has its limits. At the very least, it must comport with controlling guidelines and principles. *Samlowski v. Wooten,* 322 S.W.3d 404, 410 (Tex. 2011) (defining when a decision constitutes an abuse of discretion). And, the controlling rule or principle violated at bar, according to Keli, was article 16, § 50 of the Texas Constitution. Under that provision, "[t]he homestead of a family . . . shall be, and is hereby protected from forced sale, for the payment of all debts . . . ." TEX. CONST. art. 16, § 50. The prohibition extends to proceeds from the disposition of a homestead as well. *Grant v. Clouser,* 287 S.W.3d 914, 919 (Tex. App.–Houston [14th Dist.] 2009, no pet.). And, though the edict

3

has its exceptions, none mention the general category of "equitable liens." This may explain why the equitable lien awarded in the judgment was characterized as "equivalent to a purchase money lien"; debt for "the purchase money" of the homestead "or a part of such purchase money" falls outside the prohibition against forced sale. *Id.* art. 16, § 50(a)(1). So, if the equitable lien is the equivalent of a purchase money security interest, it may be legitimate, or so the argument goes. In determining whether it is, we initially make the following observations.

First, laws protecting a homestead against foreclosure or the payment of debt must be liberally construed. *Grant v. Clouser*, 287 S.W.3d at 919; *Kendall Builders, Inc. v. Chesson*, 149 S.W.3d 796, 807 (Tex. App.–Austin 2004, pet. denied). Second, liens or like encumbrances upon a homestead that do not fall within the exceptions provided in art. 16, § 50 are void. *Laster v. First Huntsville Properties Co.*, 826 S.W.2d 125, 129-30 (Tex. 1991). Third, purchase money liens denote a transaction wherein a person who loans money to another to acquire property obtains a lien on the property purchased. *See First Nat'l Bank v. Lubbock Feeders, L.P.*, 183 S.W.3d 875, 882 (Tex. App.–Eastland 2006, pet. denied) (stating that when a creditor makes a loan enabling a debtor to acquire an interest in goods, the creditor may obtain a purchase money security interest in the goods); *CFB-5, Inc. v. Cunningham,* 371 B.R. 175, 180 (N.D. Tex. 2007) (describing a purchase money security interest as one where the party holding the security interest gave value to the debtor that enabled the debtor to acquire the collateral). Fourth, equitable liens are contractual in nature; that is, they arise from expressed or implied agreements. *Chorman v. McCormick*, 172 S.W.3d 22, 24 (Tex. App.–Amarillo 2005, no pet.) (stating that an equitable lien arises when the surrounding

4

circumstances indicate the parties to the transaction intended that certain property would secure the payment of a debt and that the fundamental element necessary to create an equitable lien is the existence of an express or implied contract arising from circumstances which evince that the parties intended for the property to secure repayment). Next, equitable liens cannot be imposed where the claimant failed to secure an available statutory lien. *Hoarel Sign Co. v. Dominion Equity Corp.*, 910 S.W.2d 140, 143 (Tex. App.–Amarillo 1995, writ denied) (stating that because equity stays its hand when the claimant had an adequate remedy at law, one may not obtain an equitable lien when he had available to him but failed to pursue a lien created by statute); see *In re McConnell*, 122 B. R. 41, 46 (S.D. Tex. 1989) (refusing to impose an equitable lien in circumstances where the claimant could have secured a deed of trust). Finally, the validity of a lien is a question of law, subject to *de novo* review*. Williams v. Nationstar Mortg., LLC,* 349 S.W.3d 90, 94 (Tex. App.–Texarkana 2011, pet. denied). Having said this, our focus turns to the circumstances of record.

No one disputes that the abode acquired with the monies supplied by Nicholas became the homestead of Peter and Keli. Nor does anyone dispute that at least $101,000 of the $103,000 sum payable by Peter to Keli under the note represented proceeds from Keli's homestead interest in that house. Similarly undisputed is that Nicholas, as opposed to anyone else, loaned the couple the money in question. And, while it may be that the loan proceeds were earmarked for the purchase of the homestead, no one cites us to any evidence suggesting in any way that Nicholas, Peter, or Keli intended to secure repayment of the loan by imposing a lien on the realty. Nor did our own review of the record uncover such evidence. Nor are we cited to any

evidence explaining why Nicholas failed to obtain a deed of trust or like lien on the homestead in exchange for providing the means to acquire it. But, it is clear that he received none.

So, what we have here is an award of a purported lien equivalent to a purchase money security interest 1) to individuals who did not provide the loan, 2) in a transaction wherein no one intended that the home stand as security to assure repayment though the lender could have demanded as much, and 3) under circumstances suggesting that the lender lost or opted to relinquish his right to payment.[3] None of those indicia, or any other appearing of record, satisfies the criteria for imposing an equitable lien in general or one that equates to a purchase money lien, in particular. Instead, the lien insulated the debtors from bearing more than their proportionate share of a potential debt owed to a third party. As such, it cannot be "equivalent to a purchase money lien" and thereby survive the prohibitions erected by art. 16, § 50. The equitable lien encumbering the note representing Keli's proceeds from the disposition of her homestead is void, therefore.

Peter suggests, however, that because Keli already received payments mandated by the judgment of divorce she is barred from attacking it. It is generally true that a litigant cannot voluntarily accept the benefits of a judgment and then prosecute an appeal from it. *Tex. State Bank v. Amaro*, 87 S.W.3d 538, 544 (Tex. 2002). But, an exception arises where the reversal of a judgment cannot affect an appellant's right to a benefit secured under a judgment; in other words, "as long as an appellant 'accepts only that which appellee concedes, or is bound to concede, to be due him under the

---

[3]That Nicholas gave the debtors over fifty two years to repay the loan, allowed them to stop making installments once a few were made, and apparently undertook no effort to collect the debt before dying could lead one to ponder whether the loan was actually a gift or ultimately became a gift.

6

judgment he is not estopped to prosecute an appeal which involves only his right to a further recovery.'" *Id.*, *citing Carle v. Carle,* 234 S.W.2d 1002, 1004 (Tex. 1950). Both the requirements of the rule and the presence of the exception cause us to reject Peter's contention. No one questions that Keli is entitled to her portion of the community homestead. So, her accepting payment to what she is otherwise entitled falls within the exception described above.

Accordingly, we reverse and remand that portion of the divorce decree imposing an equitable lien upon the promissory note (and payments thereunder) from Peter to Keli to the extent that the note and payments thereunder represent proceeds from her homestead interest. In all other things, the judgment is affirmed.


Brian Quinn
Chief Justice